Isabel G. **ANDRADE,** et al., Plaintiffs,

v.

**Phillip J. CHOJNACKI, et al., Defendants.**

Civil Nos. W–96–CA–139 to W–96–CA–147, W–96–CA–373.

United States District Court, W.D. Texas, Waco Division.

July 1, 1999.

---

432

434

## MEMORANDUM OPINION AND ORDER

WALTER S. SMITH, JR., District Judge.

Plaintiffs bring this action pursuant to the provisions of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671, *et seq.*, 42 U.S.C. §§ 1983 and 1985(3), and pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Plaintiffs additionally assert claims under RICO and Texas state law. The Defendants have moved to dismiss many of Plaintiffs' claims and for summary judgment. After reviewing the parties' motions and briefs, the Court has determined that the Defendants' motions are partially meritorious and should be partially granted.

## I. BACKGROUND

Plaintiffs' claims arise out of the tragic events which occurred at the Mount Carmel religious center outside of Waco, Texas. Many of the underlying facts are not disputed, and have been widely publicized in the media and during various Congressional hearings. For background purposes, the Court will begin with a brief history of the Branch Davidians.[1]

In the 1930's, a splinter group of the Seventh Day Adventist Church, known as the Branch Davidians, re-located to Waco, Texas from California under the guidance of a self-styled prophet named Victor Houteff. Houteff's wife Florence assumed the leadership of the sect after his death, and prophesied that the end of the world, as foretold in the Christian Bible's Book of Revelation, would commence on April 22, 1959. Her prediction was unfulfilled, and many members abandoned the group. A small group of followers remained in Waco under the leadership of Benjamin Roden, who was succeeded by his wife, Lois. The group eventually moved out of the Waco city limits and established a commune-type settlement, known as Mount Carmel, near the small community of Elk.[2]

A young man named Vernon Howell, who later changed his name to David Koresh ("Koresh"), joined the group in 1984 and soon became embroiled in a struggle for leadership with Lois Roden's son, George ("Roden"). It was during this period that the 24–year–old Koresh married his legally acknowledged wife, a 14–year–old girl by the name of Rachel Jones, the daughter of Perry Jones who was a prominent member of the sect.[3] In 1985, Koresh and his followers were ejected from Mount Carmel at gunpoint. Koresh led them to the Angelina National Forest near Palestine, Texas, where they lived in plywood boxes, tents and converted school buses. During this period, Koresh declared himself a religious leader and prophet, preaching his own alleged divinely revealed interpretation of the Seven Seals in the Book of Revelation.

While Koresh's religious teaching did not focus on the "Golden Rule," it did focus on para-military training. As he repeatedly told his followers, "You can't die for God if you can't kill for God." Koresh armed his

---

1. Background information comes from a variety of sources, including media reports, public records, records of Congressional hearings, and, of course, proceedings during the criminal prosecution. It is impossible to divorce this civil case from the earlier criminal proceedings, and the Court hereby takes judicial notice of those proceedings. Much of the background and religious philosophy of Koresh and the Davidians comes from the grand jury and/or trial testimony of Branch Davidians Kathryn Schroeder, Victorine Hollingsworth, and Graeme Craddock.

2. Various witnesses refer to the site as "Rodenville," "Mount Carmel," or "the Compound." For simplicity, the Court will refer to the facility as "the Compound."

3. Perry Jones also performed the marriage ceremony.

followers and led them on a raid of the Mount Carmel complex in 1987. Roden was injured during the resulting shoot-out, and Koresh and his followers were arrested and tried for attempted murder. All of Koresh's followers were acquitted, while the jury was unable to reach a verdict as to the charges against Koresh.

Subsequent to the trial in 1989, Roden was arrested in Odessa, Texas for murder in an unrelated case. He was tried and found not guilty by reason of insanity, and was committed to a state mental hospital.[4] Koresh was then free to set himself up as undisputed leader of the Davidians at Mount Carmel. In 1990, he legally changed his name to David Koresh after another revelation from God. He also began recruiting new members in other American cities, as well as in Australia and Great Britain. The ramshackle outbuildings that once made up the Mount Carmel community were consolidated into a large complex, which included living quarters, a chapel, a gymnasium, as well as look-out towers and an armory. The fort-style building, referred to in later press reports as the Compound, was a reflection of Koresh's apocalyptic mentality and preaching—the end of the world was near and would be brought about by "the Beast" or "the Babylonians," which he identified as agents of the Government, particularly the Federal Bureau of Alcohol, Tobacco, and Firearms ("ATF").

Another part of Koresh's philosophy was his belief that as the new Messiah, all women belonged to him, including the wives and daughters of his male followers. Allegations of child-abuse arose when Koresh's custom of "marrying" girls as young as twelve was revealed during a child custody hearing in Michigan involving one of his followers, Sherri Jewell. These charges attracted the attention of the media, both foreign and domestic. The Waco Tribune–Herald (the "Waco Trib") began an in-depth investigation of the cult, which came to the attention of the ATF.

The ATF had other reasons for investigating Koresh and his followers, having received information that the inhabitants of the Compound were involved in the manufacture and distribution of illegal weapons, including machine guns and hand grenades. One report came from United Parcel Services ("UPS") that suspicious deliveries had been made to persons residing at the Compound, including over $10,-000 in firearms, inert grenade casings, a substantial quantity of black powder, and explosives. Other reports indicated that residents at the Compound were constructing what appeared to be a barracks-type cinder-block structure, had buried a school bus to use as a firing range and a bunker, and were stockpiling arms and other weapons, including .50–caliber weapons. Further investigation revealed that Koresh was also obtaining numerous kits which could be used to illegally convert semiautomatic weapons to fully automatic. Such information was obtained from firearms dealers with whom Koresh had dealt, former members of the Church, and family members of some of the then-current residents, some of whom are now Plaintiffs in this case. Comments made by Koresh to a number of people hinted at his dangerous and violent propensities. He stated to a child protective case worker investigating reports of child abuse that his time was coming to be revealed as a messenger and what would follow would make the Los Angeles riots pale in comparison. In addition to the increased trading in weapons, Koresh announced to his followers that the world would end before Passover of 1993. His philosophy and teachings made clear that such an end would come at the hands of "the Beast."

As part of its investigation, the ATF set up an undercover house near the Compound. The house was manned by ATF agents posing as students at the nearby Texas State Technical College, including Defendant Robert Rodriguez. Over the

---

4. Roden recently died of a heart attack at the Vernon State Hospital. News accounts indicate he may have been attempting his third escape from the facility.

next few months, the undercover agents attempted to infiltrate the compound by attending Koresh's Bible study groups. The Davidians, however, never believed the agents were merely college students because they were too old and drove expensive cars.

During December 1992, the ATF instituted plans to obtain and execute an arrest warrant for Koresh and a search warrant for the Compound. The planning and execution of the raid were in the hands of Defendant Phillip Chojnacki ("Chojnacki") (the Incident Commander) and his immediate subordinate Defendant Chuck Sarabyn ("Sarabyn") (the Tactical Coordinator). The operation was code named "Trojan Horse" (with an action code of "Showtime") and revolved upon a plan to conduct a "dynamic" entry into the Compound, which entailed surrounding the facility and entering with a strong show of force. The plan depended heavily on the element of surprise for its success in order to reduce, or prevent, the possibility of injuries to those involved—Davidians as well as agents. Defendant Stephen Higgins ("Higgins"), the ATF Director, ordered the field commanders to cancel the operation if they learned that the secrecy of the raid had been compromised.

One other consideration asserted by Plaintiffs as justification for the raid is that the ATF was facing budget scrutiny and needed a successful, high-publicity operation to warrant its continued existence.

In February, 1993, ATF representatives met with officials at the Waco Trib to request that the newspaper delay publication of its series on Koresh because of the pending criminal investigation and proposed warrant execution. The agency was concerned that publication of the articles on Koresh would upset him and possibly cause him to increase patrols and security around the Compound. However, ATF refused to reveal the date of the proposed raid, and the Waco Trib declined to delay publication.

ATF agents also met with Rural Metro Ambulance Service in order to have ambulance service available, if necessary, on the day of the raid. Through either the ambulance service, local law enforcement, or ATF itself, news of the proposed raid was leaked to the press. The raid was originally scheduled to occur on Monday March 1, and the ATF agents assigned to carry out the raid gathered the week before at Fort Hood[5] to train for execution of the arrest and search warrants.

On Thursday, February 25, Chojnacki obtained under seal from United States Magistrate Judge Dennis Green an arrest warrant for Koresh and a search warrant for the Mount Carmel premises, alleging violations of federal firearms laws.

On the 26th, the Waco Trib informed ATF that publication of the Koresh series would begin the next day—Saturday, February 27. After learning of the newspaper's decision to run its story on Saturday, ATF changed the date of the raid to Sunday, February 28. The ATF agents involved learned of the change that day.

On Saturday, February 27, the first article in the "Sinful Messiah" series appeared in the Waco Trib, and a Trib reporter received a tip that the raid had been moved from Monday, March 1 to Sunday, February 28. Similar information was passed to a local television station (KWTX–TV). Both the newspaper and KWTX–TV then made plans for various personnel to be at the Compound on Sunday morning.

Defendant Rodriguez went to the Compound on Saturday to ascertain whether the article had agitated Koresh or caused any increase in security among the Davidians. Rodriguez spent most of the day in the Compound. Koresh was upset about the article and told the other Davidians that the authorities would be coming. When Rodriguez reported to Sarabyn, he was instructed to return to the Compound on Sunday morning to make sure every-

---

**5.** Fort Hood is an army installation located approximately 45 miles southwest of Waco.

thing was still normal but to leave by 9:15 a.m.

At approximately 5:00 a.m. on Sunday, February 28, the ATF agents left Fort Hood for the Bellmead Civic Center (the "staging area"), arriving between 7:30 and 8:00 a.m. Gathering at a different location were various media representatives from both the Waco Trib and KWTX–TV, who arrived at the Compound before the ATF. At one point, there were approximately ten news representatives in four vehicles driving by the Compound, which, because of its rural location, rarely saw such traffic. One cameraman from KWTX became lost, and asked an individual in a rural mail carrier's car for assistance. The cameraman, who was wearing a KWTX-insignia jacket and identified himself as a KWTX cameraman, indicated he was looking for "Rodenville" because some sort of raid was about to occur. The mail carrier turned out to be David Jones, son of Perry Jones and brother of Koresh's legal wife, who drove directly to the Compound after his conversation with the cameraman.

Defendant Rodriguez testified at the criminal trial that he returned to the Compound pursuant to Sarabyn's instructions. He carried with him a copy of the Sunday edition of the Waco Trib, which contained the second installment of the Sinful Messiah series. Conditions inside the Compound were no different than when he had left the evening before. When he showed Compound members the article, they laughed. While Rodriguez was talking with Koresh, they were interrupted by Perry Jones. When Koresh returned after allegedly taking a telephone call, he was nervous and shaking. He told Rodriguez, within hearing of Graeme Craddock, that the ATF and National Guard were coming and said, "They got me once, they'll never get me again." Koresh then walked over to the window and looked straight at the undercover house. He turned to Rodriguez and said, "They're coming, Robert. The time has come."

Rodriguez left the Compound shortly after 9:00 a.m. and returned to the undercover house. He reported to Defendant James Kavanagh, who was in charge of that location on the morning of the raid, and Sarabyn, who was at the staging area, that Koresh was agitated and knew that the ATF and National Guard were coming. Sarabyn conferred with Chojnacki and Defendant Ted Royster and decided that the raid should go forward. Sarabyn and others began to hurry the agents, informing them that Koresh knew they were coming. The agents boarded two cattle trailers and left for the Compound. The agents on the ground were to be supported by helicopters on loan from the Texas National Guard. The use of the National Guard was approved by the Governor of Texas, Ann Richards.

Inside the Compound, Davidians gathered firearms and donned black clothing and ammunition-holding vests. The confrontation with "the Beast" was at hand.

The cattle trailers stopped in front of the Compound's main building. What followed next is hotly disputed, although various Branch Davidians were convicted of manslaughter as a result of their actions. Gunfire erupted, which resulted in the deaths of four ATF agents[6] and five Branch Davidians.[7] Numerous others, both agents and Davidians, sustained gunshot and shrapnel-related injuries. Although Koresh was seriously injured, he subsequently recovered.

In a separate confrontation, ATF agents securing the perimeter of the Compound encountered Branch Davidians Woodrow

---

**6.** The four agents killed that day were Todd McKeehan, Robert Williams, Conway LeBleu, and Steven David Willis.

**7.** The Branch Davidians who were killed during the raid, or subsequently died of injuries they received that day, were Jaydean Wendel, Perry Jones, Peter Gent, Peter Hipsman, and Winston Blake. The autopsy results, as noted in the pre-sentence investigation reports of the criminal defendants, revealed that Perry Jones, Peter Hipsman and Winston Blake were killed by gunshots delivered at close range.

**445**

Kendrick, Norman Allison and Michael Schroeder, who were attempting to gain entrance to the Compound to assist their comrades. In an exchange of gunfire, Michael Schroeder was killed.

After ATF withdrew, the FBI assumed control of the situation. Defendant Jeffrey Jamar, Special Agent in Charge of the San Antonio, Texas field office, was placed in charge. Thus began a 51–day siege during which the FBI used various tactics to coerce the Davidians into surrendering peacefully. In addition to using skilled negotiators to personally converse with Koresh, the FBI employed such tactics as bombarding the Compound with annoying music, noises, and bright lights, as well as cutting off the electricity. The FBI additionally refused to allow Davidians to speak with family members on the outside or to allow family members to enter the Compound. The Plaintiffs assert that the FBI also used various methods to prevent any of those in the Compound from leaving other than in an approved manner through the use of discouraging gunfire and flashbangs. A number of law enforcement agencies assisted in securing the Compound, and the Army loaned equipment to the FBI to assist in security, including armored vehicles to patrol the perimeter.

During the first few days of the siege, a number of Davidians left the Compound, including many of those children who were not fathered by Koresh. The adults who emerged were taken into custody. While a few were released, others were held as material witnesses or to face criminal charges. The first two elderly women to exit the Compound were inexplicably held on charges of first degree murder, although the charges were subsequently withdrawn. After no further Davidians surrendered, the FBI tactics escalated, including using the armored vehicles to destroy automobiles and go-carts located close to the Compound. In its negotiations, the FBI did not take advantage of the services of outside experts in religion or behavioral sciences.

Koresh promised to leave the Compound on a number of occasions if specific demands were met, including the broadcasting of his views and philosophy on a local Christian radio station. Although these demands were met, he failed to surrender and demanded additional concessions. The FBI agreed to allow attorneys Dick DeGuerin and Jack Zimmerman to enter the Compound in an effort to end the siege peacefully. Koresh again did not surrender, but demanded additional time while he completed his written interpretation of the Seven Seals. With no definite time frame for Koresh's completion of his work, and because of his previous broken promises to surrender, the FBI made the decision to attempt to force the Davidians from the Compound by the use of tear gas. The plan was presented to and approved by United States Attorney General Janet Reno, who is also a named Defendant.

Shortly before 6:00 a.m. on April 19, 1993, the FBI notified the Davidians by telephone that it would begin inserting tear gas into the Compound. Using Abrams tanks and Bradley armored vehicles, FBI agents began firing tear gas rounds into the Compound. At the same time, loud speakers broadcast the message that the FBI was inserting tear gas, that it was not an assault, that the Davidians should not fire on the tanks or fire would be returned, and that the Davidians should surrender and leave the Compound. Sometime during the tear gas insertion, the telephone line into the Compound was severed by one of the armored vehicles. When no Davidians emerged from the Compound, the tanks began ramming the Compound building to insert the tear gas rounds further inside. Still no Davidians left the Compound and the insertion continued. The use of the tanks not only destroyed exterior walls, but caused damage to the interior of the building including smashing some staircases and blocking some interior access, including the doorway that led to the bus buried beneath the Compound. The tear gas attack continued

**446**

for approximately six hours, but still no Davidians exited the Compound.

Shortly before noon, a fire began in a corner of the Compound. Fire was then detected at two separate locations. Because of the nature of the building and the presence of high winds, the fire quickly spread to all areas of the Compound and an explosion completed the destruction at approximately 12:20 p.m.[8] The local fire department was not permitted to approach the Compound until approximately 12:41, after the building was fully engulfed. Only nine Davidians, all adults, were able to escape from the fire. At least 73 others, including the children, perished.[9]

Nearly 300 weapons were found in the remains of the Compound, approximately 46 of which were fully automatic. Also found were approximately 800,000 rounds of ammunition, 4 functional hand grenades, and over 100 practice grenade bodies that had been modified to be functional, but which did not contain a main charge or fusing system. Also discovered were the remains of numerous other weapons, pieces of exploded grenades, and innumerable rounds of expended ammunition.

Of those adults who left the Compound on April 19 or earlier, eleven were indicted for their role in the death of the four ATF agents and the illegal conversion of weapons, including Kathryn Schroeder ("Schroeder"), Brad Eugene Branch ("Branch"), Kevin Whitecliff ("Whitecliff"), Clive Doyle ("Doyle"), Jaime Castillo ("Castillo"), Livingstone Fagan ("Fagan"), Woodrow Kendrick ("Kendrick"), Norman Washington Allison ("Allison"), Graeme

Leonard Craddock ("Craddock"), Renos Avraam ("Avraam") and Ruth Ottman Riddle ("Riddle"). Paul Gordon Fatta, who was not in the Compound on February 28, was charged with conspiracy to unlawfully manufacture and possess machine guns and aiding and abetting in the unlawful possession of machine guns. Pursuant to a plea agreement with the Government, Schroeder agreed to testify against her codefendants in exchange for being allowed to plead to a lesser charge. After a six-week trial, the Defendants were acquitted of murdering federal officers, but Branch, Whitecliff, Castillo, Fagan, and Avraam were found guilty of the lesser included offense of voluntary manslaughter. Each was also found guilty of using or carrying a firearm during and in relation to a crime of violence, as were Craddock and Riddle. Craddock was additionally found guilty of possession of a hand grenade. Their sentences ranged from 5 to 40 years.

## II. MOTION TO DISMISS

A motion to dismiss under Rule 12(b)(6) "is viewed with disfavor and is rarely granted." *Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir.1982) quoting 5A Charles A. Wright and Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1357 at 598 (1969). It is well settled that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*

---

8. Some of the more outrageous claims made by the Plaintiffs, which have absolutely no factual support, include the allegations that FBI agents (or the Delta force) entered the Compound on foot, placed an explosive device on top of the concrete bunker where the Davidians' weapons were stored, and additionally entered the gymnasium area where they had the opportunity to grab Koresh but were told not to on the command of Webster Hubbel. Such information is supported by the rankest hearsay and other suspect sources and is totally inadmissible in a legal proceeding. Such frivolous claims come close to

Rule 11 violations, and do little but detract from Plaintiffs' legitimate claims. Plaintiffs also discount Government reports that indicate the bodies of nine Davidians were found on top of the bunker because such does not fit into their theory that an explosive device was placed on top. However, it is entirely consistent with an explosion of the Compound's propane tanks.

9. Subsequent autopsies revealed that 13 adults died from gunshot wounds, along with five children.

*v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Boudeloche v. Grow Chemical Coatings Corp.*, 728 F.2d 759, 762 (5th Cir.1984); *Kaiser*, 677 F.2d at 1050. When considering such a motion, the complaint must be liberally construed in the plaintiff's favor, and all facts pleaded in the complaint should be accepted as true. *Campbell v. Wells Fargo Bank, N.A.*, 781 F.2d 440, 442 (5th Cir.1986). "The question therefore is whether in the light most favorable to Plaintiff and with every doubt resolved in his behalf, the complaint states any valid claim for relief." 5A Wright and Miller, Federal Practice and Procedure, § 1357 at 601.

In the context of Defendants' Motion to Dismiss, the Court has considered the most recent amended complaints filed by the Plaintiffs, including the Second Amended Complaint filed in *Brown, et al. v. United States, et al.* ("*Brown I*"),[10] the Third Consolidated Complaint filed in *Andrade, et al. v. Phillip J. Chojnacki, et al.*, and the complaints in *Holub, et al. v. Janet Reno, et al.* and *Holub, et al. v. United States.* The *Brown I* Second Amended Complaint is included as Attachment C to this Memorandum Opinion.

### III. SUMMARY JUDGMENT

Summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any materi-

al fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A disputed material fact is genuine if the evidence is such that a jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The initial burden to demonstrate the absence of a genuine issue concerning any material fact is on the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This burden can be satisfied by pointing out to the district court that there is an absence of evidence to support an essential element of the non-moving party's case. *Id.* Upon such a showing, the burden shifts to the non-moving party to establish that there is a genuine issue. *Id.* at 324, 106 S.Ct. 2548. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548.

### IV. DISCUSSION

██ *A. Wrongful Death/Survival Claims.* As previously noted, the Plaintiffs seek monetary damages under *Bivens*, §§ 1983 and 1985, RICO, and state law. The Plaintiffs consist of those indi-

---

10. The claims asserted by the Plaintiffs were originally filed in the Houston Division of the Southern District of Texas in nine separate lawsuits. Judge Nancy Atlas in the Houston Division granted the Government's motion to transfer the cases to this Court. When filed in the Waco Division, the cases consisted of the following: *Andrade, et al., v. Chojnacki, et al.*, W–96–CA–139; *Holub, et al., v. Reno, et al.*, W–96–CA–140 (*Holub I*); *Ferguson, et al., v. Reno, et al.*, W–96–CA–141; *Brown, et al., v. United States, et al.*, W–96–CA–142 (*Brown I*); *Riddle, et al., v. Reno, et al.*, W–96–CA–143; *Gyarfas, et al., v. United States, et al.*, W–96–CA–144; *Martin, et al., v. United States, et al.*, W–96–CA–145; *Holub, et al., v. United States, et al.*, W–96–CA–146 (*Holub II*); and *Brown, et al., v. United States, et al.*, W–96–CA–147

(*Brown II*). A subsequently filed suit, *Sylvia, et al., v. United States, et al.*, was assigned cause number W–96–CA–373. All the cases were consolidated for pre-trial, with possible consolidation for all purposes. After consolidation, the Plaintiffs have separated into three groups, represented by three separate groups of lawyers: (1) the *Andrade* plaintiffs include those filing claims in W–96–CA–139, W–96–CA–141, W–96–CA–143, W–96–CA–144, W–96–CA–145, and W–96–CA–373; (2) the *Brown* plaintiffs include the claims filed in W–96–CA–142 and W–96–CA–147; and (3) the *Holub* plaintiffs include the claims filed in W–96–CA–140 and W–96–CA–146. For simplicity, the Court will refer to the factions as the *Andrade, Brown*, or *Holub* plaintiffs.

viduals who either left the Compound after the initial ATF raid, escaped from the Compound after the fire, and/or the surviving family members of those who died either in the fire or during the initial raid. However, many of those filing suit are not appropriate Plaintiffs. A determination of who may properly assert claims is dependent upon an analysis of the wrongful death and survival statutes of state law. *See Rhyne v. Henderson County,* 973 F.2d 386 (5th Cir.1992); *Grandstaff v. City of Borger, Texas,* 767 F.2d 161 (5th Cir.1985); 28 U.S.C. § 1346(b). Sections 71.004 and 71.021 of the Texas Civil Practice and Remedies Code establish the requirements for wrongful death and survival actions. Claims arising under the statutes are "derivative actions, and condition the plaintiff's ability to recover upon the decedent's theoretical ability to have brought an action had the decedent lived." *Schaefer v. Gulf Coast Regional Blood Center,* 10 F.3d 327 (5th Cir.1994). Section 71.004 provides that a wrongful death action for damages is for the exclusive benefit of the deceased's surviving spouse, children, and parents. *Shepherd v. Ledford,* 962 S.W.2d 28, 31 (Tex.1998). Therefore, those wrongful death claims brought by any relative other than the foregoing are dismissed. Further, a cause of action for wrongful death ceases to exist upon the death of the named beneficiary. *See Johnson v. City of Houston,* 813 S.W.2d 227 (Tex.App.—Houston [14th Dist.] 1991). Therefore, the wrongful death claims brought by Solomon Malcolm, Jr., as heir to the Estate of Solomon Malcolm, Sr. for the wrongful death of Livingston Alexander Malcolm, and by Gladys Williams, as heir to the Estate of Agatha Myrtle Williams for the wrongful death of Yvette Williams Fagan, are dismissed.

■ Additionally, the "spouse" identified in the wrongful death statute refers to a "legal" spouse. It is undisputed that David Koresh was legally married to Rachel Jones and there was no dissolution of that marriage. The Court takes judicial notice of this public record. Therefore, spousal claims asserted by Robyn Bunds and Dana Okimoto are dismissed.[11]

■ Further, the claims included by the *Holub II* plaintiffs fail to allege any relationship to the decedents and seek damages only as administrator and/or administratrix of the estates of the decedents. An "estate" is not a party under Texas law and can neither sue nor be sued. *Price v. Anderson's Estate,* 522 S.W.2d 690, 691 (Tex.1975). The administrator of an estate may have a survival action, but does not possess an action for wrongful death. *See Castleberry v. Goolsby Building Corp.,* 617 S.W.2d 665, 666 (Tex.1981); *Koonce v. Quaker Safety Products & Mfg. Co.,* 798 F.2d 700, 706 (5th Cir.1986). As the complaint neither asserts claims on behalf of the named Plaintiffs nor alleges that they are the statutory beneficiaries of the decedents, the wrongful death claims in *Holub II* are dismissed, as are any such claims presented by any other administrator, heir or beneficiary.

■ Additionally, the Texas Survival Statute provides that only those causes of action based upon personal injury to health, reputation or body survive the injured person's death. § 71.021. Claims based upon purely mental or emotional injury, such as those suffered by the decedents during the FBI "siege" are such claims that do not fall within the statute. *See Plumley v. Landmark Chevrolet, Inc.,* 122 F.3d 308, 311 (5th Cir.1997). Those claims are, therefore, dismissed.

Finally, the estates of a number of the decedents are represented by a number of different administrators, legal representatives, or heirs. As an estate can recover only once, these multiples representatives

---

11. The claims of these Plaintiffs also come close to violating Rule 11, if not an actual violation, in that no reasonable attorney could have had a good faith belief in the validity of either of these women's spousal claims. While each may have some *subjective* belief in the existence of a marriage to David Koresh, the State of Texas provides no legal basis for such a claim.

will be dismissed. Also, the Court is unaware of any theory under which one individual may recover for the personal injuries suffered by another. Therefore, the claims of any individual who is seeking damages for the personal injuries of another, who is still alive, will be dismissed.

B. *Texas National Guard Defendants.* The dispositive motions in this case were filed by the United States, the individual federal defendants, and former Governor Ann Richards. In *Brown I,* the Plaintiffs named a number of individuals who were identified as members of the Texas National Guard. However, a review of the record reveals that these Defendants have never been served with process, nor is there any indication that summons has ever been issued. Accordingly, Plaintiffs will show cause within ten (10) days from the date of this Order why these Defendants should not be dismissed for failure to be served within the time frame provided by Rule 4(m) of the Federal Rules of Civil Procedure. Failure to respond in a timely manner will result in dismissal of these Defendants.

■■■■ C. *§ 1985(3).* Plaintiffs assert that Defendants conspired against them because of their religious beliefs. In order to state a claim under § 1985(3), a plaintiff must allege:

(1) a conspiracy of two or more person [sic]; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Word of Faith World Outreach Center Church, Inc. v. Sawyer,* 90 F.3d 118, 124 (5th Cir.1996), quoting *Deubert v. Gulf Federal Savings Bank,* 820 F.2d 754, 757 (5th Cir.1987). An essential element of such a claim is that the conspiracy be motivated by racial animus. *Id. See also Green v. State Bar of Texas,* 27 F.3d 1083,

1088 n. 8 (5th Cir.1994); *Deubert,* 820 F.2d at 757; *Rayborn v. Mississippi State Bd. of Dental Examiners,* 776 F.2d 530, 532 (5th Cir.1985). No such claim is made by Plaintiffs in the present case, and the *World Faith* Court specifically declined to expand § 1985(3)'s reach to a conspiracy based upon religious beliefs. Accordingly, Plaintiffs' claims under § 1985(3) are dismissed.

■■■ D. *Texas Constitutional Claims.* Although unclear, to the extent Plaintiffs seek recovery under state law for violations of the Texas Constitution, such claims are unavailable under Texas law. *See Gillum v. City of Kerrville,* 3 F.3d 117 (5th Cir.1993) (under Texas law, there is no state constitutional tort action such as provided under § 1983 or *Bivens* ). *See also City of Beaumont v. Bouillion,* 896 S.W.2d 143 (Tex.1995). Therefore, any claim for damages under the Texas Constitution is dismissed.

■■■ E. *RICO.* Initially, the Court notes that Judge Atlas dismissed Plaintiffs' RICO claims against the United States prior to the time the case was transferred to this division. Plaintiffs present no reason that this Court should revisit this issue. As Judge Atlas noted in her Order, governmental entities "are not capable of forming the criminal intent necessary to support the predicate RICO offenses. *See Lancaster Community Hosp. v. Antelope Valley Hosp. Dist.,* 940 F.2d 397, 404 (9th Cir.1991), *cert. denied,* 502 U.S. 1094, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992)." *Andrade v. Chojnacki,* Civil Action No. H–94–0923, Memorandum Opinion and Order dated April 3, 1996, p. 21. Plaintiffs' claims are equally deficient when it comes to stating a RICO claim against the individual Defendants.

■■■■■ Basically, Plaintiffs claim that the Defendants and a number of Government agencies have worked over the years to attempt to persecute various groups because of their political and/or religious beliefs, and that the Defendants have con-

spired to commit RICO violations. RICO claims require "1) a person who engages in 2) a pattern of racketeering activity, 3) connected to the acquisition, establishment, conduct, or control of an enterprise." *Word of Faith World Outreach Center Church, Inc. v. Sawyer,* 90 F.3d at 122, quoting *In re Burzynski,* 989 F.2d 733, 741–42 (5th Cir.1993). *See also Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (a claim under § 1962(c) requires "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity"). Section 1964(c) provides that a person may assert a private cause of action under RICO if that person was "injured in his business or property by reason of a violation of section 1962 of this chapter...." 18 U.S.C. § 1964(c). Because of this clear statutory language, a plaintiff may not recover for personal injuries under RICO. *Grogan v. Platt,* 835 F.2d 844, 848 (11th Cir.1988). *See also Sedima,* 473 U.S. at 496, 105 S.Ct. 3275 ("[t]he plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation"); *Schiffels v. Kemper Financial Services, Inc.,* 978 F.2d 344, 353 (7th Cir. 1992); *Berg v. First State Insurance Co.,* 915 F.2d 460, 464 (9th Cir.1990). Therefore, Plaintiffs' claims under RICO should be dismissed because they identify no injury other than personal injuries.[12]

▮▮▮▮ Plaintiffs' claims also fail because they have failed to include specific facts in their complaints that would establish a violation of RICO. Unlike other claims, a RICO claim must be plead with "specific facts, not mere conclusions, which establish" the elements of a claim under the statute. *Montesano v. Seafirst Commercial Corp.,* 818 F.2d 423, 427 (5th Cir. 1987). The claim must also allege specific facts to demonstrate that the defendant

and the RICO enterprise are separate entities. *See Ashe v.* Corley, 992 F.2d 540, 544 (5th Cir.1993); *Manax v. McNamara,* 842 F.2d 808, 811 (5th Cir.1988). In the present case, the Defendants and the alleged RICO enterprise are one and the same—the federal government.

Finally, Plaintiffs fail to state a RICO claim if the enterprise has but one goal. *Manax v. McNamara,* 842 F.2d at 811–12. Without any specific facts, Plaintiffs merely allege that the "Defendants," unspecified and unnamed, have participated in an "association-in-fact" beginning sometime in the 1960's, and that the purpose of the association was

> among other things, (1) the immobilization, repression and elimination of organizations, groups and individuals whose religious, political and other beliefs, practices and activities they oppose, including without limitation, the late Rev. Martin Luther King, the Black Panther party, the Vietnam Anti–War Movement, the Student Free Speech movement, gun groups such as NRA, tax protestors and survivalists, as in the shooting by federal agents at Ruby Ridge, and groups they characterize in derogatory terms as cults, including the General Association of the Branch Davidians 7th Day Adventist Church and its members and practitioners, and (2) vindictive and extralegal apprehension, mistreatment, retaliation and punishment in violation of the Constitution and laws of the United States, of organizations, groups and individuals they deem responsible for deaths or injuries to law enforcement officers and employees.

*Brown* Complaint, p. 76. However, Plaintiffs' complaints lack any specific allegations regarding exactly what illegal racketeering acts the Defendants committed beyond those acts associated with the

---

**12.** Even assuming for purposes of argument that the General Association of the Branch Davidians Seventh Day Adventist may bring such a claim, Plaintiffs have pled no facts that would demonstrate that the Association possessed legal title to the property, or that such an Association is even in existence. The Court notes that it is a matter of public record that there have been protracted proceedings in the state district court in Waco regarding the title to Mount Carmel which have yet to be resolved.

events at the Mt. Carmel Church. Therefore, Plaintiffs' complaints are insufficient to establish the pattern of racketeering activity required to establish liability under RICO.

■ Additionally, Plaintiffs' claims are insufficient to establish the required ongoing criminal activity required by RICO. As previously noted, "racketeering activity" consists of two or more predicate offenses. In order to establish a "pattern" of racketeering activity, a plaintiff "must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *Word of Faith*, 90 F.3d at 122, quoting *H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Continued criminal activity, or the threat of the same, must be shown by either a "closed period of repeated conduct, or an open-ended period of conduct that 'by its nature projects into the future with a threat of repetition.'" *Id.*

> A closed period of conduct may be demonstrated "by proving a series of related predicates extending over a substantial period of time." An open period of conduct involves the establishment of "a threat of continued racketeering activity." This may be shown where there exists a "specific threat of repetition extending indefinitely into the future," or "where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business."

*Word of Faith*, 90 F.3d at 122 (citations omitted). The allegations of Plaintiffs' complaints are also insufficient to establish the required continuity of criminal activity; as noted, the specific facts all relate to the isolated events occurring at Mt. Carmel. Accordingly, Plaintiffs' claims under RICO are dismissed.

*F. Claims Under § 1983.* Title 42, United States Code, § 1983 (" § 1983") creates a cause of action against any person who, while acting under color of state law, causes another to be deprived of a federally protected constitutional right. Section 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any state ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress....

■ Section 1983 was promulgated to prevent "...[a government official's] [m]isuse of power, possessed by virtue of state law and made possible only because the [official] is clothed with the authority of state law." *Johnston v. Lucas*, 786 F.2d 1254, 1257 (5th Cir.1986). *See also Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (8th Amendment); *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986) (14th Amendment); *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 677, 88 L.Ed.2d 662 (1986) (14th Amendment). Only two allegations are required in order to state a cause of action under § 1983. "First, the Plaintiff must allege that some person has deprived him of a federal right. Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law." *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Manax v. McNamara*, 842 F.2d at 812.

■ The allegations of Plaintiffs' complaints center upon actions taken by *federal* officials pursuant to *federal* law. Plaintiffs attempt to salvage their § 1983 claims by asserting that the federal officials used various state officials to assist them in the planning and execution of the raid, siege and final assault on the Compound. While a claim may lie under § 1983 against an individual who acts in concert with state officials to deprive another of important federal rights, the determination of whether the conduct of such parties constitutes state action depends upon the specific facts and circumstances

surrounding the challenged action. *Albright v. Longview Police Department*, 884 F.2d 835, 838 (5th Cir.1989) (*citing Burton v. Wilmington Parking Authority*, 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961)). The typical case raising a state action issue involves a private party's decisive step allegedly causing constitutional harm to the plaintiff, "and the question is whether the state was sufficiently involved to treat that decisive conduct as state action." *Albright*, 884 F.2d at 838, (*quoting National Collegiate Athletic Association v. Tarkanian*, 488 U.S. 179, 109 S.Ct. 454, 462, 102 L.Ed.2d 469 (1988)). However, as Defendants note, the converse is not true. A state actor, performing at the behest of federal officials, does not thereby turn a federal action into one under color of state law.

While Plaintiffs make the unsupported allegation that unnamed state officers "conspired" with federal authorities, there is no factual allegation that any "conspiracy" was conducted under state law rather than federal law. Further, there is nothing to indicate that the actions taken by the federal actors were at the behest of state officials, or that state officials were involved to such an extent that this federal action should be considered one conducted under state law. While the Texas National Guard may be considered a state actor for purposes of § 1983, the use of its facilities by federal officials does not automatically satisfy the requirement of state action. There is, therefore, nothing in Plaintiffs' complaints to impute any liability against the Defendants under § 1983. Accordingly, Plaintiffs' claims under § 1983 are dismissed.

As a result, Plaintiffs' claims under the Fourteenth Amendment are likewise subject to dismissal. The Fourteenth Amendment makes the other amendments to the United States Constitution applicable to the various states. As there is no state action in this case, Plaintiffs' claims under the Fourteenth Amendment are dismissed.

G. *Bivens/Qualified Immunity*.[13] The remaining claims asserted by Plaintiffs arise under the First, Fourth, Fifth and Eighth Amendments to the United States Constitution. *Bivens* provides the vehicle for redressing a violation of those rights. Such an action may be maintained only against a federal official acting in his/her individual capacity. *See Federal Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). To the extent Plaintiffs seek relief under *Bivens* against the United States, any of its agencies, or any individual Defendant in his or her official capacity, such claims are dismissed.

A *Bivens* action is akin to one under § 1983. As with a § 1983 action, an individual defendant is entitled to assert the defense of qualified immunity. *Hunter v. Bryant*, 502 U.S. 224, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). Qualified immunity is not merely a defense to liability, but a shield from suit. *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The determination of whether qualified immunity is applicable to any defendant is a matter that is initially determined by the Court as a matter of law. The issue goes to the jury only if disputed fact issues must be resolved. *Hunter v. Bryant, supra*.

A public official is entitled to qualified immunity if his conduct violates no clearly established statutory or constitutional law. *Evans v. Ball*, 168 F.3d 856 (5th Cir.1999); *Sorenson v. Ferrie*, 134 F.3d 325, 327 (5th Cir.1998). *See also Salas v. Carpenter*, 980 F.2d 299, 305 (5th

---

**13.** Although qualified immunity is usually analyzed in the context of a motion to dismiss since the doctrine provides immunity from suit, many of the claims asserted by Plaintiffs against the individual Defendants are also asserted against the United States under the Federal Tort Claims Act ("FTCA"). As the United States has filed a motion for summary judgment as to many of these claims, to which the Plaintiffs have fully responded, disposition of many claims under a motion to dismiss standard will also dispose of the same claims presented in the context of a motion for summary judgment, and vice versa.

Cir.1992). In making this determination, the Court undertakes a two-step analysis. *Duckett v. City of Cedar Park,* 950 F.2d 272, 278 (5th Cir.1992). *See also Siegert v. Gilley,* 500 U.S. 226, 231–32, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). First, the Court determines whether, under current law, the plaintiff has alleged a constitutional violation. *Siegert v. Gilley,* 500 U.S. at 231–32, 111 S.Ct. 1789; *Evans v. Ball,* 168 F.3d at 860; *Salas v. Carpenter,* 980 F.2d at 305. Only if the plaintiff has crossed this threshold, does the Court move to the second stage of the analysis, which requires two separate inquiries: (1) whether the allegedly violated right was "clearly established" at the time of the incident; and, if so, (2) whether the defendant's conduct was objectively unreasonable in light of the clearly established law. *Id.; Hare v. City of Corinth,* 135 F.3d 320, 326 (5th Cir.1998). In making this determination, "the court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact." *Hunter v. Bryant,* 112 S.Ct. at 537. "If reasonable public officials could differ on the lawfulness of the defendant's actions, the defendant is entitled to immunity." *White v. Taylor,* 959 F.2d 539, 544 (5th Cir.1992). The qualified immunity standard is broad enough to encompass mistakes in judgment by protecting "all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant,* 112 S.Ct. at 537, *quoting Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

▬ *1. Eighth Amendment.* The Eighth Amendment is inapplicable to the present case because its protections do not attach until after conviction and sentence.[14] *Ingraham v. Wright,* 430 U.S. 651, 671 n. 40, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) ("Eighth Amendment scrutiny is appropriate only after the [government] has com-

plied with the constitutional guarantees traditionally associated with criminal prosecution"); *Johnson v. City of Dallas,* 61 F.3d 442, 444 n. 5 (5th Cir.1995) ("It is equally evident that the state does not incur Eighth Amendment liability even where injury occurs as the result of official conduct, unless the individual was being held in custody after criminal conviction"). Even were Plaintiffs to be considered pretrial detainees as a result of the stand-off, their claims still would not arise under the Eighth Amendment. *See Baker v. Putnal,* 75 F.3d 190, 198 (5th Cir.1996) ("[P]re-trial detainees may not bring a cause of action based on the Eighth Amendment. It protects only those who have been convicted"). Accordingly, Plaintiffs have failed to state a cognizable claim under the Eighth Amendment.

*2. First Amendment.* Plaintiffs appear to claim that the Defendants violated their First Amendment rights to religious freedom by enforcing various gun control laws against them. They also assert that the actions of the Defendants denied them access to the Courts. A review of the various complaints persuades the Court that Plaintiffs have failed to state a cognizable claim under the First Amendment.

▬ An individual's right to the free exercise of his religious beliefs does not "relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Employment Div., Dept. of Human Res. v. Smith,* 494 U.S. 872, 879, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). The laws enforced against the Branch Davidians in this case dealt with the possession and manufacture of illegal firearms. Such laws apply to all individuals equally, regardless of their religious practices or affiliation. The courts have noted that when the government seeks to enforce a

**14.** This is one more of Plaintiffs' claims that could justify the imposition of Rule 11 sanc-

tions.

" 'valid and neutral law of general applicability,' the fact that an investigation incidentally targets a specific religious group does not render the investigation violative of the first amendment." *United States v. Allibhai*, 939 F.2d 244, 250 (5th Cir.1991), *cert. denied*, 502 U.S. 1072, 112 S.Ct. 967, 117 L.Ed.2d 133 (1992) (citation omitted).

Plaintiffs also appear to be asserting that the Defendants have targeted them, and other fundamentalist religious groups, for investigation because of their religious affiliation. As support for this Plaintiffs point to the Randy Weaver case in Idaho. However, Plaintiffs offer nothing to connect their religious beliefs with those of the Weavers other than the stockpiling of guns and ammunition. In this case, it was not the mere collection of guns and ammunition that brought the Davidians to the attention of authorities, but rather the amassing of *illegal* guns and explosive devices.

■■■■ As noted, Plaintiffs also appear to assert that their right of access to the courts was violated by the Defendants "covering up and otherwise hinder[ing] the discovery of facts establishing the liability of the U.S. for the causes of action asserted herein." *Andrade* Third Consolidated Complaint, ¶ 7.26. The First Amendment right of access to the courts protects an individual's right to petition the government for redress of grievances. *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 514, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). This right "assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights." *Wolff v. McDonnell*, 418 U.S. 539, 579, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). "The right of access, in its 'most obvious and formal manifestation ... protects one's physical access' to the courts." *Foster v. City of Lake Jack-*

*son*, 28 F.3d 425, 429 (5th Cir.1994), citing *Crowder v. Sinyard*, 884 F.2d 804, 811 (5th Cir.1989), *cert. denied*, 496 U.S. 924, 110 S.Ct. 2617, 110 L.Ed.2d 638 (1990). Plaintiffs include no allegations that explain how the alleged "cover-up" has hindered them from gaining physical access to any court or court process.

■■■■ Finally, Plaintiffs have presented nothing to the Court to establish that the "right" they identify, to be protected from discovery abuses, was clearly established at the time of the events pertinent to this case. A right is "clearly established" when "its contours are sufficiently clear that a reasonable official would have realized that his conduct violated that right, not simply that the conduct was otherwise improper." *Foster v. City of Lake Jackson*, 28 F.3d 425, 429 (5th Cir.1994). There is nothing to indicate that the right of access has been expanded to include the discovery abuses claimed by Plaintiffs, as noted by the *Foster* court. Accordingly, even if Plaintiffs have stated a claim under the First Amendment, the Defendants would be entitled to qualified immunity because the right was not clearly established at the time of the commission of the alleged actions. Therefore, Plaintiffs' claims based upon the First Amendment will be dismissed.[15]

*3. Fourth Amendment.* The Fourth Amendment protects citizens from unreasonable searches and seizures. Plaintiffs assert that nearly everything about the Defendants' behavior during the initial raid, the stand-off and final fire was in violation of the Fourth Amendment.

■■■■ *a. Collateral Estoppel.* Many of the claims raised by Plaintiffs in relation to the initial raid have already been litigated and are barred by principles of *stare decisis*, collateral estoppel, and *res judicata. Stare decisis* is a legal doctrine

---

**15.** Plaintiffs assert the same claim under the due process clause of the Fifth Amendment. The foregoing analysis applies equally to Plaintiffs' Fifth Amendment claim regarding access to the courts. Therefore, Plaintiffs'

Fifth Amendment claim for denial of access to the courts against all Defendants are dismissed. Because this is the only claim asserted against Defendant Edward S.G. Dennis, he is hereby dismissed from this action.

that means "like facts will receive like treatment in a court of law." *Taylor v. Charter Medical Corp.,* 162 F.3d 827, 832 (5th Cir.1998), citing *Brock v. El Paso Natural Gas Co.,* 826 F.2d 369, 374 (5th Cir.1987). It is preferred "because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Hohn v. United States,* 524 U.S. 236, 118 S.Ct. 1969, 1977, 141 L.Ed.2d 242 (1998), citing *Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). "Under *res judicata* [also known as claim preclusion], a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). Collateral estoppel, or issue preclusion, on the other hand, "is applied to bar litigation of an [issue] previously decided in another proceeding by a court of competent jurisdiction when—but only when—the facts and the legal standard used to assess the facts are the same in both proceedings." *Taylor v. Charter Medical Corp.,* 162 F.3d 827, 832 (5th Cir.1998). "Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry,* 449 U.S. at 94, 101 S.Ct. 411. Both *res judicata* and collateral estoppel "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Id.* at 95, 101 S.Ct. 411.

■■■■ Collateral estoppel depends upon three elements: "(1) the issue at stake must be identical to the one involved in the prior action; (2) the issue must have been actually litigated in the prior action; and (3) the determination of the issue in the prior action must have been a necessary part of the judgment in that earlier action." *RecoverEdge L.P. v. Pentecost,* 44 F.3d 1284, 1290 (5th Cir.1995).[16] *See also Copeland v. Merrill Lynch & Co.,* 47 F.3d 1415, 1422 (5th Cir.1995). Collateral estoppel differs from *res judicata* in that it is an equitable doctrine which should be "applied only when the alignment of the parties and the legal and factual issues raised warrant it." *Id.* at 1423, citing *Nations v. Sun Oil Co.,* 705 F.2d 742, 744–45 (5th Cir.1983) (*en banc*), *cert. denied,* 464 U.S. 893, 104 S.Ct. 239, 78 L.Ed.2d 229 (1983). However, mutuality of parties is not a requirement. *Allen v. McCurry,* 449 U.S. at 94–95, 101 S.Ct. 411. The Supreme Court eliminated such a requirement in applying collateral estoppel to bar relitigation of issues "and has allowed a litigant who was not a party to a federal case to use collateral estoppel 'offensively' in a new federal suit against the party who lost on the decided issue in the first case." *Id.,* at 95, 101 S.Ct. 411. However, "the concept of collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate that issue in the earlier case." *Id.*

■■■■ Under any of the foregoing theories Plaintiffs' claims as they relate to the initial raid by the ATF in regard to the search and arrest warrants that were issued are barred. The Defendants at the criminal trial in *United States v. Branch,* 91 F.3d 699 (5th Cir.1996), *cert. denied,* 520 U.S. 1185, 117 S.Ct. 1466, 137 L.Ed.2d 681 (1997) fully litigated the propriety of the warrants and their service, including whether or not there was a violation of the "knock and announce" rule. The warrants

---

**16.** The *RecoverEdge* court notes that some cases recognize a fourth element to collateral estoppel—that there be "no special circumstance that would render preclusion inappropriate or unfair." 44 F.3d at 1290 n. 12, citing *United States v. Shanbaum,* 10 F.3d 305, 311 (5th Cir.1994). As noted in Wright & Miller, "Such general statements should be approached with great caution." 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, FEDERAL PRACTICE AND PROCEDURE § 4426, at 264–65 (1981).

and the method of service were determined to be lawful. Although not all of the Plaintiffs in this present civil litigation were involved in the previous criminal trial, the legal and factual determinations are equally binding upon them. As noted above, *res judicata* bars relitigation among the same parties *and their privies.* The Defendants at the criminal trial had an even stronger reason to put the Government's proof to the test because they were seeking their freedom, not merely money damages. As such, the Plaintiffs may not relitigate these issues in this forum.

■ Even if the propriety of the search and arrest warrants were open to relitigation, a careful review of them reveals that the supporting affidavits contained sufficient probable cause to justify their issuance. The minor defects Plaintiffs identify in the Aguilera affidavit do not effect this determination.[17] Sufficient probable cause would exist even without those statements. Therefore, Plaintiffs have failed to state a claim under the Fourth Amendment based upon the impropriety of the arrest and search warrants issued in the criminal case. The reasons supporting the individual Defendants' Motion to Dismiss are equally applicable to the United States' Motion for Summary Judgment as to Plaintiffs' claim under the FTCA.

Defendants argue that all of Plaintiffs' claims relating to the initial raid are barred by collateral estoppel, *res judicata* and/or *stare decisis* because of the criminal proceedings. The Court does not agree that all issues raised by Plaintiffs in relation to the initial raid are barred. Whether excessive force was used is still at issue because a finding on that issue was not necessary to the jury's verdict in *Branch* or the Fifth Circuit's opinion. Plaintiffs' claims relating to whether the ATF shot at the Davidians indiscriminately and without provocation were not determinations that

the jury was asked to make. Additionally, the criminal defendants could have been found guilty of voluntary manslaughter even though they did not initiate the shootout if the jury determined that the force used to repel the ATF assault was greater than was justified under the circumstances.

■ *b. Unlawful Seizure/Excessive Force.* "Violation of the Fourth Amendment requires an intentional acquisition of physical control." *Brower v. County of Inyo,* 489 U.S. 593, 595–97, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989). "A seizure occurs even when an unintended person or thing is the object of the detention or taking. . . ." *Id.* However, a seizure does not occur unless the individual's freedom of movement is curtailed by some means intentionally applied by the Government.

> It is clear, in other words, that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied.*

*Id.* at 1381 (emphasis in original). A seizure does not occur so long as the individual is fleeing from or resisting authority. *See California v. Hodari,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991).

> A seizure requires not only that the reasonable person feel unfree to leave, but also that the subject actually yield to a show of authority from the police or be physically touched by the police. Under this test, a police officer who chases a fleeing suspect unsuccessfully has not

---

**17.** The "defects" noted by Plaintiffs include: (1) a statement that Koresh possessed the upper and lower receivers of AK–47 firearms when in fact the AK–47 has no lower receiver; and (2) a statement that the Branch Davidians received "clandestine" publications such as *Shotgun News* when such publication is available by subscription on a national basis.

seized that person. Similarly, an officer who yells "Stop, in the name of the law!" at a fleeing person who continues to flee has not effected a seizure. *Tom v. Voida,* 963 F.2d 952, 957 (7th Cir. 1992). In the instant case, the majority of the Branch Davidians did not submit to a show of authority, but actively resisted being taken into custody. As such, no seizure occurred within the Fourth Amendment during either the initial raid, the stand-off or the final assault, and Plaintiffs have failed to state a claim.

Even if the Court were to determine that the Fourth Amendment was applicable to those Davidians who were killed or injured by the ATF on the day of the initial raid, the individual Defendants would still be entitled to qualified immunity. Plaintiffs have not identified any named Defendant as one who either initiated the shooting at the Compound or actually injured any of its inhabitants.

 Additionally, Plaintiffs' claims as they relate to the planning of the initial assault, the methods to be used during the stand-off, or the planning of the final assault are not sufficient to state a claim under the Fourth Amendment. The decision to use a "dynamic" entry is not, in and of itself, a violation of the Fourth Amendment. The information available to the ATF, which is contained in the affidavit supporting the warrants, was more than sufficient to justify the use of such an entry by any reasonable law enforcement officer. Finally, none of the Plaintiffs have made any claim that the raid plans called for the ATF agents to shoot the Davidians without provocation. The same is true for Plaintiffs' allegations in relation to the stand-off and final assault. There are absolutely no specific facts contained in Plaintiffs' complaints that would suggest that any of the named Defendants planned any activity for the specific purpose of causing harm to the Davidians. Therefore, Plaintiffs have failed to state a claim against any of the individual Defendants under the Fourth Amendment arising out of a claim of an unlawful seizure during the initial raid, the 51–day stand-off, or the final assault.

*c. Initial ATF Raid/Shooting of Michael Schroeder.* A separate shooting incident occurred some hours after the initial raid. During this exchange of gunfire, Davidian Michael Schroeder was killed. Davidians Norman Allison and Woodrow Kendrick, who were accompanying Schroeder in an attempt to enter the Compound, were arrested by ATF agents. At the criminal trial, both Allison and Kendrick were acquitted.

The Plaintiffs assert that the death of Schroeder was the result of excessive force and that Defendants are liable under the Fourth Amendment and the FTCA. The Plaintiffs further assert a claim of malicious prosecution and abuse of process for both Norman Allison and Rita Riddle, who left the Compound after the initial raid but before the fire. These claims are the subject of a motion for summary judgment by the Government, to which the Plaintiffs have responded with controverting summary judgment proof. Having reviewed the summary judgment proof, the Court is persuaded the Defendants are entitled to summary judgment, which will be discussed in detail in connection with Plaintiffs' other claims under the Federal Tort Claims Act. The individual Defendants have not moved for dismissal based upon qualified immunity as to these claims apparently because Plaintiffs have not presented any specific factual allegations involving any of the named Defendants in the claims arising out of these circumstances. Therefore, to the extent that Plaintiffs are seeking relief under *Bivens* against the United States or any individual Defendant based upon the death of Michael Schroeder, or the arrest and/or prosecution of Norman Allison and Rita Riddle, such claims are dismissed.

 *d. Defendant William Johnston.* According to the allegations of Plaintiffs' complaints, Defendant Johnston was the Assistant United States Attorney involved in assisting the ATF in drafting the appli-

cations for the search and arrest warrants. Although not supported by any facts, Plaintiffs additionally make the conclusory allegation that Defendant Johnston was involved in the planning of the raid on the Compound. As noted with the ATF Defendants, the mere planning of a dynamic entry is not a basis for liability under any theory, and there is no allegation that the plans for the raid included the indiscriminate and unprovoked shooting of the Davidians. As to any claims relating to the planning of the raid, Defendant Johnston would likewise be entitled to qualified immunity, if not absolute prosecutorial immunity. *See Kalina v. Fletcher*, 522 U.S. 118, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997). Accordingly, Defendant Johnston will be dismissed from this action.

4. *Fifth Amendment.* Although Plaintiffs' claims are untenable under the Fourth Amendment, the circumstances surrounding the initial assault, the standoff and the final fire are subject to analysis under the due process clause of the Fifth Amendment. *See County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (analysis of substantive due process claim under the Fourteenth Amendment). Plaintiffs assert the Defendants are liable because they shot into the Compound indiscriminately and without provocation, that the Defendants subjected them to torture during the stand-off, and that the Defendants either started the fire in the Compound or that the Defendants failed to rescue them from the fire, whether started by the Government or other Davidians.

 *a. Special Relationship.* Plaintiffs assert that the Defendants are liable under the Fifth Amendment because they failed to rescue the Davidians trapped in the fire and because they stood in a special relationship with the Davidians. These claims are untenable. The Fifth Circuit has not recognized any type of "state created danger" theory of liability. *See Doe v. Hillsboro Independent School District,* 113 F.3d 1412, 1414 (5th Cir.1997) *(en banc). See also Randolph v. Cer-*

*vantes,* 130 F.3d 727 (5th Cir.1997), *cert. denied,* —— U.S. ——, 119 S.Ct. 65, 142 L.Ed.2d 51 (1998). Nor has the Fifth Circuit recognized a cognizable "special relationship" claim in the law enforcement context. *See Piotrowski v. City of Houston,* 51 F.3d 512, 515 n. 6 (5th Cir.1995); *Walton v. Alexander,* 44 F.3d 1297 (5th Cir.1995) *(en banc).* A "special relationship" arises only when an individual is "involuntarily confined or otherwise restrained against his will pursuant to a governmental order or by the affirmative exercise of state power." *Walton v. Alexander,* 44 F.3d at 1299. Neither circumstance is present in the instant case as there was no involuntary confinement of the Plaintiffs and they were not restrained in the Compound against their will pursuant to any governmental order or affirmative exercise of state power. Therefore, Plaintiffs have failed to state a claim under the Fifth Amendment based upon a "state created danger" or the violation of a "special relationship."

 Even if either of these novel theories were adopted today, Defendants would still not be subject to liability. Because that was not the recognized law at the time of the occurrence of the events central to this lawsuit, the individual Defendants would be entitled to qualified immunity for their actions.

 *b. The Initial Raid.* As previously noted, Plaintiffs assert that the Defendants are liable because they shot into the Compound indiscriminately and without provocation. Although such a claim may not be available under the Fourth Amendment, Plaintiffs' complaints are sufficient to state a claim for relief under the Fifth Amendment. The due process clause of the Fifth Amendment "was intended to prevent the government 'from abusing [its] power, or employing it as an instrument of oppression....'" *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 196, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989). "We have emphasized again and again that '[t]he

touchstone of due process is protection of the individual against arbitrary action of government,' whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *County of Sacramento v. Lewis,* 118 S.Ct. at 1716 (internal citations omitted). The threshold question in a due process challenge to executive action is "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.* at 1717 n. 8. If a government agent shot at a suspect who was not endangering the lives of the agent or others and who was not fleeing, such behavior would undoubtedly shock the conscience.

Although Plaintiffs have sufficiently stated a claim under the Fifth Amendment, the individual ATF Defendants named in Plaintiffs' complaints would still be entitled to qualified immunity. As previously noted in relation to Plaintiffs' Fourth Amendment claims, Plaintiffs make global allegations regarding the actions of the ATF, but identify none of the named Defendants as having actually fired the first shots. The factual allegations against those specifically named in the complaints relate only to the planning and supervision of the raid, not as to the actual execution of the raid at the Compound.

■■ The allegations of a complaint under *Bivens* must be factually specific; a complaint that contains mere conclusory allegations is insufficient to overcome a Defendant's qualified immunity defense. The facts alleged in a complaint must provide a legal basis for a reasonable finder of fact to grant the plaintiff relief. *Investors Syndicate of America, Inc. v. City of Indian Rocks Beach, Fla.,* 434 F.2d 871, 876 (5th Cir.1970). Conclusory allegations carry no presumption of truthfulness. *Kaiser Aluminum,* 677 F.2d at 1050. Even Plaintiffs' allegations against Timothy Gaborie, an ATF agent who was alleged to have fired indiscriminately into the Compound, are insufficient because Plaintiffs have identified no Davidian who was injured as a result of Gaborie's actions. Accordingly, the individual Defendants' motion to dismiss will be granted as to the actions taken on the day of the initial raid.

■ *(1) Defendant Ann Richards.* At the time of the raid, Defendant Richards was the Governor of Texas. The pleadings indicate that Defendant Richards' liability is based upon the fact that she approved the use of Texas National Guard helicopters and personnel to assist the ATF on the date of the raid. Plaintiffs' own pleadings provide the basis for Defendant Richards' qualified immunity. Plaintiffs assert that the ATF lied to Governor Richards to obtain her approval for use of the National Guard by informing her that there was evidence of an illegal drug manufacturing plant at the Compound. Plaintiffs' other contentions against this Defendant are mere conclusory allegations that she "conspired" with the other Defendants. Such factually unsupported assertions are insufficient to overcome such a Defendant's qualified immunity. Accordingly, Defendant Richards will be dismissed from this lawsuit.

■ *c. The Stand–Off.* Plaintiffs' claims regarding the actions taken during the 51–day stand-off are also subject to dismissal under a Fifth Amendment analysis. Initially, the Court notes that Plaintiffs have failed to state a claim under *Bivens* for the period during the stand-off because they have identified no injury suffered as a result of the FBI's actions. Those inside the Compound may have been made uncomfortable, but that was the very purpose behind the FBI's actions—to make life so intolerable in the Compound that its inhabitants would be forced to surrender.

Additionally, the tactics used by the FBI during the stand-off are clearly not the type of behavior that may be said to "shock the contemporary conscience." Although the lights, annoying noises and loss of utilities made life in the Compound un-

comfortable, Plaintiffs make no allegation that their use resulted in physical injury to any of the inhabitants. Nor was the decision to insert tear gas into the Compound the type of behavior that would be deemed shocking. The non-intrusive methods used by the FBI were clearly ineffective because they failed to cause the Davidians to surrender. The insertion of tear gas was obviously the next logical step.

Tear gas has long been an accepted, and effective, law enforcement tool for dislodging recalcitrant suspects. Its purpose is to make the environment so uncomfortable that a resistant suspect will surrender. The fact that tear gas may be dangerous through long-term exposure is a red herring raised by Plaintiffs. Tear gas, obviously, is not intended for long-term exposure, and there is nothing to indicate that the Defendants had any intention of subjecting the Davidians, adults or children, to long-term exposure. The obvious intent was to use the tear gas to force the Davidians to voluntarily leave the Compound. Any long-term exposure was the result of the Davidians' choice to remain in the Compound after the tear gas had been inserted and to force their children to remain there, also. Although much has been said of the heartlessness of the Government in subjecting innocent children to tear gas, it should be noted that those who had the power to protect the children, their parents, did not do so. The adult Davidians elected to remain in the Compound, and kept their children there, even after repeated warnings by the FBI that tear gas was going to be inserted. The Davidians chose to allow their children to be exposed to the tear gas for over six hours, even though they had no gas masks that would fit the children. There is, therefore, no basis for liability based upon the stand-off or the decision to insert tear gas into the Compound.

*d. The Fire.* As to the fire itself, there is nothing to indicate that the Defendants deliberately set fire to the Compound.[18] The Fifth Amendment's due process clause protects individuals only from intentional actions taken by the government; it does not protect against mere negligence.

> [T]he due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm.... [T]he Fourteenth Amendment is not a "font of tort law to be superimposed upon whatever systems may already be administered by the States...." "[Our] Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." We have accordingly rejected the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct, and have held that the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process. It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.

*County of Sacramento v. Lewis,* 118 S.Ct. at 1717–1718 (internal citations omitted).

The facts of the present case are akin to those presented in *County of Sacramento,* in which a passenger on a fleeing motorcycle was killed when struck by a pursuing police car. In both situations,

---

**18.** In fact, there is a good amount of summary judgment proof that the Davidians themselves started the fire. Tape recordings made from concealed listening devices inside the Compound revealed a number of individuals discussing spreading fuel and starting fires in several different places.

officers faced the necessity for action while not escalating an already dangerous situation. In such a case, the standard for Fifth Amendment liability is whether the officers intended to physically harm the suspect. This standard is greater than either "deliberate indifference" or "reckless disregard." As such, Plaintiffs have failed to state a claim under the Fifth Amendment based upon the allegation that the Defendants intentionally set the fire at the Compound and Plaintiffs' request to conduct additional discovery in order to find such evidence is without merit. Even if the Court were to consider that Plaintiffs had stated a claim under the Fifth Amendment, the individual Defendants would still be entitled to qualified immunity. Plaintiffs have presented no specific factual allegations regarding any of the named Defendants that would indicate that any of them actually started the fire on purpose, or that there was a plan to burn the Davidians out. Therefore, the Defendants' motion to dismiss based upon the intentional starting of the fire will be granted.

■■■■ One issue that is not so readily dismissed under a Fifth Amendment analysis is the Plaintiffs' assertion that FBI agents fired into the Compound without provocation during the insertion of the tear gas and after the fire started. Plaintiffs assert that the FBI's actions kept a number of Davidians from leaving the Compound. If Plaintiffs' allegations are true, due process would be implicated as such behavior would rise to a level that would shock the conscience. Plaintiffs present at least some evidence to support their claim, including the affidavits of Clive Doyle, David Thibideau, and the opinions of Edward F. Allard and Maurice Cox, experts in thermal imaging who proffer the opinion that certain images on the FLIR tape taken on April 19 are muzzle flashes from a fully automatic firearm being fired from outside the Compound. Further, Plaintiffs present a report of an interview given by FBI Special Agent Charles Riley who was assigned to duty at the Compound on April 19. The interview

report indicates that Riley stated he heard gunshots coming from one of the FBI sniper positions on the day of the fire, the same sniper position where Defendant Lon Horiuchi was located.

However, except for Defendant Horiuchi, no other Defendant is·identified as either firing into the Compound or ordering other FBI agents to do so. Therefore, the remaining individual FBI Defendants would be entitled to qualified immunity arising out of the fire. Defendant Horiuchi may also be entitled to qualified immunity, but there are sufficient facts at issue that dismissal based upon qualified immunity is inappropriate at this time.

■■■■ *e. Access to Courts.* Plaintiffs assert that the individual Defendants and Defendant Edward S.G. Dennis, Jr. violated their Fifth Amendment rights by denying them access to the courts. Specifically, Plaintiffs contend that the Defendants covered up and hindered the discovery of facts allegedly establishing the liability of the Defendants and the United States for the causes of action contained in their complaints. Under Fifth Circuit authority, Plaintiffs have failed to state a claim under the Fifth Amendment. Generally, the right of access to the courts protects an individual's physical access to the courts. *Foster v. City of Lake Jackson,* 28 F.3d 425, 430 (5th Cir.1994). The right of "meaningful access" may be implicated, however, only where the ability to file suit was delayed or blocked altogether. *Foster,* 28 F.3d at 430. There has been no such deprivation in this case.

■■■■ *5. Supervisory Liability.* Supervisory officials cannot be held vicariously liable solely on the basis of their employer-employee relationship with an alleged tortfeasor because there is no doctrine of *respondeat superior* in a *Bivens* action. *Cronn v. Buffington,* 150 F.3d 538, 544 (5th Cir.1998), *Abate v. Southern Pac. Transp. Co.,* 993 F.2d 107, 110 (5th Cir. 1993). Rather, a supervisory official may be held liable when he is either personally involved in the acts causing the deprivation

of a person's constitutional rights, or "if he implements a policy so deficient that the policy itself acts as a deprivation of constitutional rights." *Cronn v. Buffington,* 150 F.3d at 544. *See also Thompkins v. Belt,* 828 F.2d 298, 304 (5th Cir.1987). To prevail against a supervisory official, Plaintiffs must show that such a defendant's actions, or inactions, if any, "caused" or was the "moving force" in causing a plaintiff harm. *See Monell v. Department of Social Services,* 436 U.S. 658, 692, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Vela v. White,* 703 F.2d 147, 153 (5th Cir.1983). Here, Plaintiffs have failed to state with particularity any facts showing that supervisory Defendants such as Janet Reno, William Sessions, Webster Hubbel, Daniel Edward Conroy, Daniel M. Hartnett, Stephen E. Higgins, John McGraw, Lawrence A. Potts, or David C. Troy were "personally involved" in any of the alleged violations or implemented any policies which in themselves were a violation of any constitutional rights. Therefore, these Defendants are entitled to qualified immunity.

*H. Conspiracy.* Plaintiffs assert that the Defendants not only deprived them of their constitutional rights, but conspired to do so. However, a conspiracy, in and of itself, is not actionable in the absence of an actual violation of § 1983 (or *Bivens* ). *Pfannstiel v. City of Marion,* 918 F.2d 1178 (5th Cir.1990). Therefore, as Plaintiffs' *Bivens* claims have been dismissed, any claim that the Defendants conspired to deprive Plaintiffs of any Constitutional rights must also be dismissed.

*I. Federal Tort Claims Act.* It is hornbook law that the United States, as a sovereign nation, is immune from suit except to the extent that the United States has consented to be sued. *McNeily v. United States,* 6 F.3d 343, 347 (5th Cir. 1993). "One of the vehicles by which the United States has consented to be sued is the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671–80." *Id.* The FTCA waives the sovereign immunity of the United States, making it liable in tort "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. The United States is liable for damages caused

> by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b).

1. *Certification.* Under § 2679(d)(1), if the Attorney General certifies that a federal employee was acting within the scope of his office or employment at the time of the incident out of which a state law claim arises, a civil action arising out of such incident shall be deemed an action against the United States, and the United States shall be substituted as the sole defendant with respect to those claims. The authority for making such a certification has been delegated by the Attorney General to the Assistant Attorney General in charge of the Civil Division. 28 C.F.R. § 15.3 (1996). The Assistant Attorney General in charge of the Civil Division has redelegated certification authority to directors of the Tort Branch. Appendix to 28 C.F.R. § 15.3 (1996).

Jeffrey Axelrad, Director of the Torts Branch, Civil Division, United States Department of Justice, has certified that at the time of the conduct alleged, individual defendants Janet Reno, William Sessions, Lawrence Potts, Steven Higgins, Daniel Hartnett, Daniel Conroy, David C. Troy, Phillip Chojnacki, Charles Sarabyn, Peter Mastin, Ted Royster, James Cavanaugh, Earl Dunagan, Darrell Dyer, William Buford, Davy Aguilera, Jeffrey Jamar, Robert Ricks, Oliver Revell, Richard Rogers, Lon T. Horiuchi, Byron Sage, Timothy Gaborie, John McGaw, and William Johnston, were acting within the scope of their employment. See Appendix Tab D to the United States' Motion to Dismiss. In response to Plaintiffs' objections to that certification, Defendants have

submitted a revised certification that clarifies that all individual federal defendants were acting within the scope of their federal employment at all material times. Appendix R to Defendants' Reply Memorandum of Law. The Court "is entitled to treat the Attorney General's certification as *prima facie* evidence that the employee's conduct at issue occurred within the scope of [his] employment." *Rodriguez v. Sarabyn*, 908 F.Supp. 442, 445 (W.D.Tex. 1995), citing *S.J. & W Ranch v. Lehtinen*, 913 F.2d 1538, 1543 (11th Cir.1990), *cert. denied*, 502 U.S. 813, 112 S.Ct. 62, 116 L.Ed.2d 37 (1991). As Plaintiffs have offered nothing to counter the certification, the United States' motion for substitution and to dismiss the FTCA claims against the previously named individual Defendants will be granted. Plaintiffs have made no credible showing that the individual federal Defendants were acting outside the scope of their employment at any time material to this lawsuit.

█ 2. *Exhaustion of Administrative Remedies.* Defendants argue that the claims asserted by a number of the Plaintiffs must be dismissed as these Plaintiffs have failed to exhaust their administrative remedies. Title 28, United States Code, Section 2675(a) ("§ 2675") provides, in pertinent part:

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail. The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section.

"[T]he filing of an administrative claim for relief [is] a jurisdictional prerequisite to suit." *United States v. Burzynski Cancer Research Institute*, 819 F.2d 1301, 1306 (5th Cir.1987), *cert. denied*, 484 U.S. 1065, 108 S.Ct. 1026, 98 L.Ed.2d 990 (1988). Therefore, those Plaintiffs whose FTCA claims have not been administratively exhausted must be dismissed. This is true even of those claims that became ripe after suit was filed. *See McNeil v. United States*, 508 U.S. 106, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993).

A proper disposition of this argument requires an analysis of the various pleadings filed in a number of the consolidated lawsuits. Those at issue are the last-filed complaints in *Ferguson, Brown I, Brown II*, and *Sylvia*. A number of the *Ferguson* plaintiffs failed to comply with the administrative claim requirement. After they did, they re-filed their claims in *Sylvia*. The same course was followed by the *Brown I* plaintiffs, whose premature claims were re-filed in *Brown II*.

The FBI and ATF received amended claims presented on behalf of *Ferguson* plaintiffs Debborah Brown, Sherry Houtman Burgo, and Floyd Houtman, Jr., which were dated in December of 1994. In such cases, the time within which suit may be brought runs from the date of the amended claim. 28 C.F.R. § 14.2(c). The FBI and ATF received new claims presented on behalf of eight others dated in February of 1995, approximately one month after the *Ferguson* complaint was filed with the Court.[19] The FBI and ATF received "supplemental" claims dated February 24, 1995 from three plaintiffs seeking damages for their own personal injuries for the first time.[20] One plaintiff,

---

**19.** These eight Plaintiffs are Judith Mary Houtman, Joel Matthew Houtman, Tobias Hosea Houtman, Gabriella Marie Houtman, Geoffrey Sellors, Marjorie Sellors, Derek Lovelock, and Livingston Fagan.

**20.** These claimants, Renae Fagan, Neharah Fagan, and Natalie Nobrega, previously had presented claims for damages arising out of the deaths of their mothers. While the wrongful death claims were ripe at the time

Wendel August Elliott, had not presented an administrative claim to either agency prior to the filing of *Ferguson.* Tabs B and C to the Appendix of Defendants' Motions to Dismiss. Despite the argument of Plaintiffs' attorneys to the contrary, there is no record that any administrative claim from Wendel August Elliott was filed with the United States. Therefore, his claims under the FTCA are dismissed.

In light of the foregoing, all FTCA claims of Plaintiffs Debborah K. Brown, Wendel Augustus Elliott, Judith Mary Houtman, Joel Matthew Houtman, Tobias Hosea Houtman, Gabriella Marie Houtman, Sherry Ann Burgo, Floyd Houtman, Jr., Geoffrey Sellors, Marjorie Sellors, Livingston Fagan, and Derek Lovelock in the *Ferguson* case will be dismissed. Also, the claims of Plaintiffs Debborah Brown, Sherry Houtman Burgo, Clive Doyle, Tillie Friesen, Floyd Houtman, Jr., Joel Jones, John Sinclair, Dorothy Forde Sinclair, Reginald Sinclair, Vailoa Vaega, Grace Jasmine Adams, Sina Saipaia, Willie Saipaia, Dana Houtman, and Derek Lovelock presented in *Brown I* will be dismissed. Further, the personal injury claims of *Ferguson* Plaintiffs Renae Fagan, Nehara Fagan, and Natalie P. Nobrega will be dismissed. Finally, any claims presented by Norman Allison regarding events prior to March 2, 1993 will be dismissed, including his claims for false arrest and assault occurring on February 28, 1993.

Although Plaintiffs argue to the contrary, Clive Doyle was not a plaintiff in *Ferguson.* In *Sylvia,* Doyle sought damages solely on behalf of the estate of Shari Elayna Doyle; he did not include a claim for his own injuries. The *Sylvia* plaintiffs were incorporated into the Third Consolidated Complaint along with all plaintiffs other than those in the *Holub* and *Brown* actions. The Third Consolidated Complaint does not contain claims for the es-

tate of Shari Elayna Doyle or any claims by Clive Doyle. Therefore, the only FTCA claims presented by Clive Doyle are those included in *Brown I* and *Brown II,* and only the *Brown II* claims are viable.

The same is true of the claims presented by Plaintiff Joel Jones. Despite Plaintiffs' assertion, no Plaintiff by the name of "Joe Jones" joined in any of these consolidated actions. A "Joel Jones" is a Plaintiff in the *Brown* actions, but did not join in either the *Ferguson* or the *Sylvia* action. His only viable FTCA claims, therefore, are in *Brown II.*

3. *Service on the United States.* The Government argues that the claims asserted in *Brown II* must be dismissed because the United States was not served within 120 days of the filing of the complaint, as required by Rule 4(m) of the Federal Rules of Civil Procedure. The Government asserts that process has never been served, and that return of service is not indicated on either the docket sheet of this Court or that of the Southern District of Texas where the suit was originally filed. Plaintiffs argue that *Brown II* was properly served. However, they provide no proof of their argument, such as a return of service or even a United States mail receipt. Therefore, there is nothing to indicate that *Brown II* was timely served upon the United States, and Plaintiffs have not shown good cause for failing to do so in a timely manner. Accordingly, the remaining claims asserted in *Brown II* are dismissed.

4. *Law of the State.* Under the explicit language of the FTCA, the United States is liable only when the law of the state where the act or omission occurred would impose such liability. *Johnson v. Sawyer,* 47 F.3d 716, 727 (5th Cir.1995) (*en banc*). "Thus, even a violation of the United States Constitution, actionable under *Bivens,* is not within the FTCA unless

---

this Complaint was filed, their own personal injury claims had not been presented and thus

were not ripe.

the complained of conduct is actionable under the local law of the state where it occurred." *Id.* Therefore, to the extent Plaintiffs have premised FTCA liability on any Federal statute or Constitutional right, there can be no liability.[21]

■■■■■ 5. *Bystander Liability.* A number of the Plaintiffs base their claims for mental anguish on the fact that they witnessed the burning of the Compound on television. Existing Texas law does not provide recovery in such a situation. Texas has adopted the elements for a bystander claim identified by the California Supreme Court in *Dillon v. Legg,* 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912, 920 (1968). *See Freeman v. City of Pasadena,* 744 S.W.2d 923, 923–24 (Tex.1988). In order to recover as a bystander, the plaintiff is required to prove that:

> (1) The plaintiff was located near the scene of the accident, as contrasted with one who was a distance away from it; (2) The plaintiff suffered shock as a result of a direct emotional impact upon the plaintiff from a sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence; and (3) The plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.

*United Services Automobile Ass'n. v. Keith,* 970 S.W.2d 540, 542 (Tex.1998). To accept Plaintiffs' argument that recovery may be based upon the emotional impact of seeing the final fire on television would require this Court to adopt an unwarranted extension of Texas law. As the *Keith* court noted, "Texas law still requires the bystander's presence when the injury occurred and the contemporaneous perception of the accident." *Id.* at 542. As Plaintiffs were not present at the time of the fire and since they did not discover until some time afterward which individuals had died and/or been injured in the fire, they cannot fulfill the requirements for bystander recovery under Texas law.

■■■ 6. *Discretionary Function Exception.* One exception to the waiver of sovereign immunity in the FTCA is the discretionary function exception. This exception provides that the courts have no jurisdiction over claims against the United States "based on the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved is abused." 28 U.S.C. § 2680(a). The latest analysis of the exception is found in *United States v. Gaubert,* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991).

> The exception covers only acts that are discretionary in nature, acts that "involv[e] an element of judgment or choice," ... and "it is the nature of the conduct, rather than the status of the act" that governs whether the exception applies.... The requirement of judgment or choice is not satisfied if a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," because "the employee has no rightful option but to adhere to the directive." ...

> Furthermore, even "assuming the challenged conduct involves an element of judgment," it remains to be decided "whether that judgment is of the kind that the discretionary function exception was designed to shield." ... Because the purpose of the exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort," ... when properly construed, the exception "protects only gov-

---

**21.** This would include any claimed violation of a federal statute, such as the posse comitatus act. To the extent Plaintiffs seek liability under the posse comitatus act itself, the same would be unavailable as the act does not provide a private cause of action. *See Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 511 (2d Cir.1994).

ernmental actions and decisions based on considerations of public policy." ... *United States v. Gaubert,* 499 U.S. at 322–323, 111 S.Ct. 1267. A discretionary act is one that involves choice or judgment; the exception is not exclusively limited to policymaking or planning functions. *ALX El Dorado, Inc. v. Southwest Savings and Loan Association/FSLIC,* 36 F.3d 409, 411 (5th Cir.1994).

> We venture that almost any exercise of governmental discretion could be overly parsed so as to focus on minute details of sub-decisions to the point that any relationship to policy would appear too attenuated. But doing that obscures the very purpose of the discretionary function exception. Clearly, that purpose is to prevent judicial "second-guessing" of decisions arising from and grounded in policy. We are neither in a position— nor do we desire to be—to dissect and second-guess each discreet aspect of a total design package that is grounded in policy considerations pertaining to national defense. Indeed, such tunnel-visioned analyses would render the discretionary function exception nugatory and open virtually every decision that implements a governmental policy to liability under some waiver of sovereign immunity.

*Baldassaro v. United States,* 64 F.3d 206, 211–212 (5th Cir.1995), *cert. denied,* 517 U.S. 1207, 116 S.Ct. 1823, 134 L.Ed.2d 929 (1996). The discretionary function exception, then, does not apply if "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Buchanan v. United States,* 915 F.2d 969, 971 (5th Cir.1990), citing *Berkovitz by Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). "Conduct cannot be discretionary if mandated by law." *Buchanan v. United States,* 915 F.2d at 971. As in the *Buchanan* case, "no statute, regulation, or policy does, or indeed could, specifically prescribe a course of action for [law enforcement] officials to follow in every [situation]." *Id.*

Plaintiffs argue that a number of decisions made by Defendants create liability for the United States because they do not fall within this discretionary function exception. Plaintiffs contend that Defendants were negligent in the following circumstances: (1) the ATF's decision to mount a "dynamic" raid and entry to serve the search and arrests warrants; (b) the FBI's decision to use tear gas in the April 19 final confrontation; (c) the FBI's decisions regarding the manner in which the intervening siege was conducted; (d) the training and supervision of the federal employees involved in all operations; and (e) the initial investigation of the Davidians that culminated in the February 28 raid. These activities are clearly the type that the discretionary function exception was designed to protect.

■ Plaintiffs' argument that the discretion of federal officials was "regulated" and therefore the discretionary function exception does not apply is mistaken. The mere existence of federal statutes or regulations is not dispositive. The issue is whether those regulations, statutes or policies allow the employee to exercise judgment and choice, or whether they *"specifically* prescribe[ ] a course of action for an employee to follow." *Gaubert,* 499 U.S. at 322, 111 S.Ct. 1267 (emphasis added). Plaintiffs have not identified any regulations, statutes or policies that prescribed the conduct taken by the Defendants in any of the identified situations.

Additionally, as previously noted, the violations of the constitution and other laws and regulations identified by Plaintiffs are not supported by the summary judgment proof. Therefore, the Government's motion to dismiss Plaintiffs' claims regarding the circumstances previously noted will be granted.

■ 7. *Law Enforcement Proviso.* An "exception" to the discretionary function exception exists for intentional torts committed by federal investigative or law

enforcement officers. This "law enforcement proviso" provides:

> Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights: *Provided,* that, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of [the FTCA] shall apply to any claim arising, on or after the date of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution. For purposes of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violation of Federal law.

28 U.S.C. § 2680(h). Even though a claim may fall within the law enforcement proviso, it may, nevertheless, still be barred by the discretionary function exception. *See Sutton v. United States,* 819 F.2d 1289, 1295 (5th Cir.1987). Therefore, to the extent that Plaintiffs classify their claims relating to the planning of the raid, standoff, or final assault as falling within the law enforcement proviso, they are still barred by the discretionary function exception because they involve the permissible exercise of law enforcement policy judgment.

■■■ However, there are some circumstances relating to the initial raid and final fire at the Compound that could give rise to a negligence cause of action against the United States under the Tort Claims Act. As previously noted, if one or more ATF agents shot into the Compound indiscriminately and without provocation, such would be the type of behavior that could lead to liability. Additionally, although the decision to use tear gas to attempt to oust the Davidians from the Compound may not be actionable, the method in which it was inserted may have been negligent if Government agents actually blocked the Davidians from safely exiting the building after inserting the tear gas. Further, there is insufficient evidence at this point for the Court to determine, as a matter of law, how the fire was started in the Compound (although there is nothing to support Plaintiffs' claim that the Government started the fire intentionally). If the tanks inserting the tear gas actually did topple lit lanterns into carelessly stored hay, there could be a finding of negligence. Finally, the decision not to allow the fire trucks immediately upon the property has not been addressed by the parties. There might be a claim for negligence in that regard, also. Accordingly, the Motion to Dismiss and/or for Summary Judgment filed by the United States will be partially granted in all respects except for the foregoing.

■■■ *a. Michael Schroeder.* Although the circumstances included in Plaintiffs' complaints relating to the death of Michael Schroeder are insufficient to state a claim under *Bivens,* such claims may provide a cause of action under the law enforcement proviso of the FTCA. The uncontroverted summary judgment proof before the Court is that of the witnesses who testified at the criminal trial. ATF Agent Jimmy Brigance testified that he personally saw Schroeder fire at the agents after Schroeder had been spotted by Brigance and after the ATF agents had identified themselves. The affidavit of Norman Allison does not contradict the ATF agents' testimony because Allison makes no claim that he witnessed the first shot, only that he thought the first shot came from "ahead of us." Further, Allison's statement that he did not see Schroeder holding a gun after he saw Schroeder drop to the ground some 90 feet away, is not inconsistent with Brigance's testimony. The statement of Kendrick also does not contradict Brigance's testimony because Kendrick admits that he lost sight of Schroeder and, consequently, has no personal knowledge of who shot first.

Plaintiffs request additional time to conduct discovery because Michael Schroeder's blue cap, which he was wearing on

the day he died, has recently been discovered in the possession of the United States Attorney's Office. Plaintiffs theorize that the blue hat will establish that Schroeder was shot at close range. However, there is absolutely no factual basis for this theory. Even Allison, who was 90 feet away, does not make any statement that would indicate that Schroeder was shot at close range. Plaintiffs' theories are insufficient to overcome the Government's summary judgment proof, which establishes that the ATF agents were justified in shooting Michael Schroeder because they returned fire only after they identified themselves and were shot at first by Michael Schroeder. *See Reese v. Anderson,* 926 F.2d 494 (5th Cir.1991).

Additionally, Plaintiffs do not identify any specific evidence that could be discovered, but only indicate that if allowed to conduct discovery they *might* be able to find something to refute the evidence already presented at the criminal trial. Plaintiffs merely "believe" that the government witnesses may have been lying without offering any specific proof in that regard. As such, there is no need for additional discovery into these matters. "It is clear that a plaintiff cannot defeat a motion for summary judgment by merely restating the conclusory allegations contained in his complaint, and amplifying them only with speculation about what discovery might uncover." *Paul Kadair, Inc. v. Sony Corp.,* 694 F.2d 1017, 1029–30 (5th Cir.1983).

> Something more than a fanciful allegation is required to justify denying a motion for summary judgment when the moving party has met its burden of demonstrating the absence of any genuine issue of material fact. A "bare assertion" that the evidence supporting the plaintiff's allegation is in the hands of the defendant is insufficient to justify a denial of a motion for summary judgment under Rule 56(f).

*Id.* at 1030, citing *Contemporary Mission, Inc. v. United States Postal Service,* 648 F.2d 97, 107 (2d Cir.1981).

Plaintiffs' desire to attack the government witnesses' credibility provides no basis to deny or delay ruling upon Defendants' motion for summary judgment. When confronted with uncontradicted affidavits or testimony, "neither a desire to cross-examine an affiant nor an unspecified hope of undermining his or her credibility suffices to avert summary judgment." *National Union Fire Ins. Co. v. Argonaut Ins. Co.,* 701 F.2d 95, 97 (9th Cir.1983). Rather, "the general rule is that specific facts must be produced in order to put credibility in issue so as to preclude summary judgment. Unsupported allegations that credibility is in issue will not suffice." 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure, § 2726 at 119 (1983). Simply alleging that a witness may have a self-interest is insufficient. Therefore, Plaintiffs' request to delay a decision on Defendants' summary judgment motion while they have Schroeder's hat tested is denied. As a result, summary judgment will be granted as to the claims of any Plaintiffs arising out of the death of Michael Schroeder.

*8. Malicious Prosecution/Abuse of Process.* Although unavailing under *Bivens,* Plaintiffs' claims relating to the arrest and prosecution of Norman Allison and the detention of Rita Riddle could additionally be raised under the FTCA. A review of the summary judgment proof presented reveals that the Government is entitled to judgment as a matter of law in regard to these claims.

■ *a. Plaintiff Norman Allison.* Allison's claims are based upon malicious prosecution, abuse of process and false imprisonment, and arise out of the shooting involving Michael Schroeder. As previously noted, this separate incident occurred some time after the initial raid upon the Compound. The knowledge of the ATF agents at the time was that the Branch Davidians had fired on them without provocation, killing four ATF agents. It was under these circum-

stances that ATF agents securing Mt. Carmel's perimeter encountered Schroeder, Allison and Kendrick. As previously noted, the uncontroverted facts establish that Michael Schroeder fired on the ATF agents without provocation after knowing their identity. However, at the time, it was impossible for the agents to tell how many individuals had fired shots, or whether those firing were attempting to escape from Mt. Carmel or to enter the Compound to provide reinforcements. When Allison was apprehended, he was carrying a firearm and approximately 100 rounds of ammunition. Under those circumstances, it was not unreasonable for the ATF agents to take Allison into custody. As such, there is absolutely no basis for a claim of false imprisonment. Further, the facts available to the agents formed the basis for the charges finally brought against Allison. As such, he has no basis for a claim of abuse of process.

 A claim for malicious prosecution requires the following elements: (1) commencement of a criminal prosecution by the defendant; (2) with malice; (3) without probable cause; (4) which ended in an acquittal; and (5) resulted in damages. *Pete v. Metcalfe*, 8 F.3d 214, 219 (5th Cir. 1993). In this case, there was clearly probable cause for Allison's prosecution.

 A claim for abuse of process requires the following elements: "(1) that the defendant made an illegal, improper, perverted use of the process; (2) that the defendant had an ulterior motive or purpose in exercising such illegal, perverted, or improper use of process; and (3) that damage resulted to the plaintiff from the irregularity." *Detenbeck v. Koester*, 886 S.W.2d 477, 480 (Tex.App.—Houston [1st Dist.] 1994, no writ). Such a claim requires that the process be used "to accomplish an end which is beyond the purview of the process, and which compels a party to do a collateral thing which he would not be compelled to do." *Id.* at 480. The tort compensates a plaintiff when process is used against him for a collateral purpose, such as obtaining property or the payment of money—something which is not the proper subject of the proceeding itself. If the process is used for the purpose for which it was intended, "even though accompanied by an ulterior motive, no abuse of process occurs." *Id. See also In Re Burzynski*, 989 F.2d 733, 739 (5th Cir. 1993). Without a showing that the use of the process itself was illegal, a claim for abuse of process must be dismissed. *In Re Burzynski*, 989 F.2d at 739.

 Plaintiffs have presented nothing to establish that the process used or issued in this case was illegal or otherwise improper. The search and arrest warrants were duly issued by a United States Magistrate Judge and were determined in the criminal trial to be proper. Further, the indictments of Allison and the other criminal defendants were used to criminally prosecute the defendants, which is not an "illegal, improper, or perverted" use of an indictment. Even assuming for the sake of argument that the government had an improper motive in prosecuting Allison or the other defendants, the process itself was used as intended—Allison and the others were criminally prosecuted. "[T]here is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *Detenbeck*, 886 S.W.2d at 480 (internal quotations omitted). Accordingly, summary judgment will be granted as to any claims asserted by Norman Allison arising out of his arrest and prosecution.

 b. *Rita Riddle*. The claims relating to the arrest and detention of Rita Riddle are similarly without merit. Rita Riddle was in the Compound on the day of the ATF raid. She left on March 21, 1993, at which time she was ordered taken into custody as a material witness by the United States Magistrate Judge for the Western District of Texas. The Magistrate Judge's Order was supported by an affidavit explaining Rita Riddle's potential role as a material witness to the events of February 28, 1993 and to the activities of

David Koresh and the Branch Davidians. Riddle was released from the custody of the United States Marshal three days later on March 25, 1993. Magistrate Judge Green ordered Riddle released to the Salvation Army Halfway House in Waco. She was subsequently released from the Halfway House on June 8, 1993 and was permitted to leave the District on December 20, 1993. As was true in the case of Norman Allison, Riddle's role in the shooting of the ATF agents was not clear when she first emerged from the Compound— whether participant or material witness. There was sufficient probable cause to take her into custody when she left the Compound, and her continued incarceration was pursuant to a duly and lawfully issued order. Therefore, she has no claim for false arrest or imprisonment. She likewise has no claim for malicious prosecution or abuse of process, under the previously outlined analysis. Therefore, summary judgment will be granted as to those claims asserted by Rita Riddle related to her detention.

 *9. Miscellaneous Claims.* Plaintiffs assert a number of additional claims that likewise have no basis in law. In accord with Fifth Circuit authority, Texas law also does not recognize a tort duty owed to Plaintiffs to protect them from the actions of third parties. *See Crider v. United States,* 885 F.2d 294 (5th Cir.1989), *cert. denied,* 495 U.S. 956, 110 S.Ct. 2561, 109 L.Ed.2d 743 (1990); *Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195 (Tex.1995). *See also* RESTATEMENT (SECOND) OF TORTS, §§ 314, 315. If it is determined that some of the Davidians actually started the fire in this case, the United States would not be liable for failing to protect the remaining Davidians. Likewise, there would be no liability based upon the Government's failure to end the stand-off successfully.

 Further, there is no basis for any claim based upon invasion of privacy. Under Texas law, there are four distinct invasion of privacy torts: (1) intrusion upon seclusion, (2) appropriation of name or likeness, (3) public disclosure of private facts, and (4) publicity placing a person in a false light. *Mitre v. Brooks Fashion Stores, Inc.,* 840 S.W.2d 612, 621 (Tex. App.—Corpus Christi 1992, writ denied). The "false light" tort is barred by the libel and slander exceptions to the FTCA (28 U.S.C. § 2680(h)), and neither appropriation nor public disclosure of private facts appear applicable to the facts of this case. In order to recover under the "intrusion" prong, the Plaintiffs must prove that the intrusion was unwarranted. *Carr v. Mobile Video Tapes, Inc.,* 893 S.W.2d 613, 622 (Tex.App.—Corpus Christi 1994, no writ). In this case, any intrusion was the result of a lawful investigation and the execution of legal warrants. Therefore, there is no basis for any claim under an invasion of privacy theory. In accordance with the foregoing, it is

**ORDERED** that the United States' Motion to Substitute is **GRANTED** and the United States is substituted for all individual Defendants for all viable claims under the Federal Tort Claims Act. It is further

**ORDERED** that the United States' Motion to Dismiss and Motion for Partial Summary Judgment are partially **GRANTED** as to all claims except those under the Federal Tort Claims Act related to the initial raid on the compound, the actions of the FBI during the insertion of tear gas on April 19, and the final fire. It is further

**ORDERED** that the Motion to Dismiss filed by the individual federal Defendants is **GRANTED** and all individual federal Defendants are **DISMISSED** from this action except for Defendant Lon Horiuchi. It is further

**ORDERED** that the Motion to Dismiss filed by Defendant Ann Richards is **GRANTED** and she is **DISMISSED** from this action. It is further

**ORDERED** that all claims presented in *Ferguson, et al., v. Reno, et al.,* W–96–CA–141; *Brown, et al., v. United States, et al.,* W–96–CA–142; and *Brown, et al., v. United States, et al.,* W–96–CA–147 are **DIS-**

**MISSED** and all remaining suits and claims are consolidated for all purposes. To the extent their claims are not covered by the foregoing, the claims of the following Plaintiffs are additionally **DISMISSED** in accordance with the foregoing:

1. GRACE JASMINE ADAMS—For death of sister REBECCA SAIPAIA and as Heir and/or Representative of her Estate

2. JOSEPH W. ALLEN—For death of grandchildren HOLLYWOOD SYLVIA, RACHEL ESTER SYLVIA, and JOSHUA SYLVIA

3. NORMAN WASHINGTON ALLISON—For personal injuries relating to his arrest and prosecution

4. GUILLERMO ANDRADE—For death of granddaughter CHANEL ANDRADE

5. ISABEL ANDRADE—For death of granddaughter CHANEL ANDRADE

6. JACQUELINE ANDRADE—For deaths of sisters JENNIFER ANDRADE and KATHERINE ANDRADE

7. SHELLY AUSLOOS—For death of brother STEVEN SCHNEIDER

8. ALFRED LeROY BENTA—For death of sister SUSAN MARJORIE BENTA

9. ARTHUR HEARD BENTA—For death of sister SUSAN MARJORIE BENTA

10. LEYTON EUSTACE BENTA—For death of sister SUSAN MARJORIE BENTA

11. DEBBORAH K. BROWN—For death of daughter SHARI ELAYNA DOYLE under FTCA, and as Heir and/or Representative of her Estate

12. ROBYN BUNDS—For death of husband DAVID KORESH, and as Heir and/or Representative of his Estate

13. JORGE COHEN—For death of brother PABLO COHEN, and as Heir and/or Representative of his Estate

14. RAUL COHEN—For death of brother PABLO COHEN, and as Heir and/or Representative of his Estate

15. SANDRA J. CONNIZZO—For death of son MICHAEL SCHROEDER and for injuries to grandson BRYAN SCHROEDER

16. DONELL K. CORNWELL—For death of sister JAYDEAN WENDEL

17. LEANORA LAURA De SILVA—For deaths of sisters DAISY MARTIN and BERYL THERESA NOBREGA

18. JOAQUIN DONES—For death of grandson PETER HIPSMAN

19. MARGIE DOUGLAS—For death of sister MARY JEAN ESTELLA BORST

20. CLIVE DOYLE—For personal injuries and for death of daughter SHARI DOYLE, and as Administrator of her Estate, under the FTCA

21. WENDEL AUGUSTUS ELLIOTT—For death of daughter BEVERLY ADORE ELLIOTT under the FTCA

22. SONIA ELSETH—For death of sister MARY JEAN ESTELLA BORST

25. TILLIE FRIESEN—For death of husband RAYMOND FRIESEN under the FTCA and as Heir and/or Representative of his Estate

26. PAULETTE BRENDA GDANIEC—For death of sister SUSAN MARJORIE BENTA

27. BRUCE GENT, as Heir and/or Representative of the Estates of the following:

PETER GENT

DAYLAND GENT KORESH

NICOLE GENT KORESH

PAIGES KORESH

28. ELIZABETH GYARFAS—For death of granddaughter STARTLE SUMMERS

29. OLIVER GYARFAS, SR.—For death of granddaughter STARTLE SUMMERS

30. BONNIE HALDEMAN—For deaths of grandchildren CYRUS BEN JOSEPH, STAR HADASSAH HOWELL, SERENITY SEA JONES KO-

RESH, DAYLAND GENT, PAIGES GENT, BOBBIE LAND KORESH, CHICA JONES KORESH, LITTLE ONE JONES · KORESH, STARTLE SUMMERS, CHANEL ANDRADE, and MAYANA SCHNEIDER

31. BERRY HAUGEN—For death of sister MARY JEAN ESTELLA BORST

32. CLIFFORD "GORDIE" HAUGEN—For death of sister MARY JEAN ESTELLA BORST

33. CURTIS HAUGEN—For death of sister MARY JEAN ESTELLA BORST

34. GLEN HAUGEN—For death of sister MARY JEAN ESTELLA BORST

35. CATHERINE HIPSMAN—For death of brother PETER HIPSMAN

36. EUGENE HIPSMAN, JR.—For death of brother PETER HIPSMAN

37. JOHN CHARLES HIPSMAN—For death of brother PETER HIPSMAN

38. MICHAEL RALPH HIPSMAN—For death of brother PETER HIPSMAN

39. MILDRED HIPSMAN—For death of grandson PETER HIPSMAN

40. PAUL JOHN HIPSMAN—For death of brother PETER HIPSMAN

41. STEPHAN M. HIPSMAN—For death of brother PETER HIPSMAN

42. PEARL HORSFIELD—For death of sister LORRAINE SYLVIA

43. BOBBY WAYNE HOWELL—As Co-administrator and Legal Representative of the Estates of BOBBIE LAYNE KORESH, STAR HADASSAH HOWELL and CYRUS BEN JOSEPH HOWELL

44. MARIE CORNWELL HUTCHISON—For deaths of grandchildren JAUNESSA WENDEL, LANDON WENDEL, PATRON WENDEL, and TAMARAE WENDEL

45. SUE JOHNSON—For death of brother STEVE SCHNEIDER

46. JOEL JONES—For death of father PERRY JONES under the FTCA and any claim for deaths of siblings RACHEL JONES HOWELL KORESH, MICHELLE JONES KORESH, and DAVID JONES, or as Heir and/or Representative of their Estates

47. MARY BELLE JONES—For deaths of grandchildren CYRUS HOWELL KORESH, STAR HOWELL KORESH, BOBBIE LANE KORESH, SERENITY SEA KORESH, CHAHKA KORESH and LITTLE ONE JONES KORESH

48. SAMUEL N. JONES—For deaths of siblings DAVID JONES, MICHELLE JONES, and RACHEL JONES HOWELL KORESH

49. AARON JAY LITTLE—For death of brother JEFFREY CURTIS LITTLE

50. LONNIE C. LITTLE—For deaths of grandchildren DAYLAND LORD LITTLE and KARA BRITTANI LITTLE

51. PATRICIA MAY LITTLE—For deaths of grandchildren DAYLAND LORD LITTLE and KARA BRITTANI LITTLE

52. STUART A. LITTLE—For death of brother JEFFREY CURTIS LITTLE

53. CHRISTYN MABB, through Next Friend William Mabb—For injuries suffered by mother KATHRYN SCHROEDER and siblings JACOB MABB, SCOTT MABB, and BRYAN SCHROEDER

54. JACOB MABB, through Next Friend William Mabb—For injuries suffered by mother KATHRYN SCHROEDER and siblings CHRISTYN MABB, SCOTT MABB, and BRYAN SCHROEDER

55. SCOTT MABB, through next Friend William Mabb—For injuries suffered by mother KATHRYN SCHROEDER and siblings CHRISTYN MABB, JACOB MABB, and BRYAN SCHROEDER

56. WILLIAM MABB—For personal injuries and for injuries suffered by children CHRISTYN MABB, JACOB MABB, and SCOTT MABB

57. GAIL MAGEE—For death of sister LORRAINE SYLVIA

58. SOLOMAN MALCOLM, JR.—For death of brother LIVINGSTON ALEXANDER MALCOLM

59. Estate of SOLOMAN MALCOLM, SR., through His Heir Soloman Malcolm, Jr.—For the death of son LIVINGSTON ALEXANDER MALCOLM

60. DANIEL MARTIN, through next Friend Sheila Judith Martin—For death of siblings LISA MARTIN, ANITA MARTIN, SHEILA MARTIN and WAYNE JOSEPH MARTIN, and as Heir and/or Representative of their Estates

61. HELEN MARTIN—For deaths of grandchildren ANITA MARIE MARTIN, LISA MARIE MARTIN, SHEILA RENEE MARTIN, and WAYNE JOSEPH MARTIN

62. JAMES MARTIN, through Next Friend Sheila Judith Martin—For deaths of siblings LISA MARTIN, ANITA MARTIN, SHEILA MARTIN, and WAYNE JOSEPH MARTIN, and as Heir and/or Representative of their Estates

63. JoANN MARTIN—For death of brother DOUGLAS WAYNE MARTIN

64. JOSEPH W. MARTIN—For deaths of grandchildren ANITA MARIE MARTIN, LISA MARIE MARTIN, SHEILA RENEE MARTIN, and WAYNE JOSEPH MARTIN

65. KIMBERLY MARTIN, through Next Friend Sheila Judith Martin—For death of siblings LISA MARTIN, ANITA MARTIN, SHEILA MARTIN, and WAYNE JOSEPH MARTIN, and as Heir and/or Representative of their Estates

66. NORMAN J. MARTIN—For death of brother DOUGLAS WAYNE MARTIN

67. DANIEL MARTINEZ, JR., through Next Friend Daniel Martinez, Sr.—For deaths of siblings CRYSTAL JEWEL BARRIOS, ISAIAH BARRIOS, ABIGAIL MARTINEZ, AUDREY MARTINEZ, and JOSEPH MARTINEZ

68. GAIL MONBELLY—For death of sister ALLISON BERNADETTE MONBELLY

69. J.P. MORRISON—For death of granddaughter MELISSA MORRISON

70. MICHAEL MORRISON—For death of sister ROSEMARIE MORRISON

71. N. A. MORRISON—For death of granddaughter MELISSA MORRISON

72. DANA OKIMOTO—For death of husband DAVID KORESH, and as Heir and/or Representative of his Estate

73. MARGARET PARKER—For deaths of grandchildren HOLLYWOOD SYLVIA and RACHEL ESTER SYLVIA, and for injuries to grandson JOSHUA SYLVIA

74. DAVID PEARCE, JR.—For deaths of siblings HOLLYWOOD SYLVIA and RACHEL ESTER SYLVIA, and for injuries to brother JOSHUA SYLVIA

75. JULIE PEARCE—For deaths of siblings HOLLYWOOD SYLVIA and RACHEL ESTER SYLVIA, and for injuries to brother JOSHUA SYLVIA

76. EARL PETERSON—For death of granddaughter MAYANAH SCHNEIDER

77. WAYNE F. PETERSON—For death of sister JUDY VIOLET PETERSON SCHNEIDER

78. SHIRLEY PUTTKAMMER—For death of granddaughter MAYANAH SCHNEIDER

79. SIDNEE REAMER—For death of brother STEVEN SCHNEIDER

80. RITA FAYE RIDDLE—For death of brother JAMES LOYE RIDDLE, JR.

81. Estate of FLORECETA RIVERA SONOBE, through Heirs and/or Representatives Anacleto Rivera, Elpedio Rivera, Emmanuel Rivera, Jesse Rivera, Joel Rivera, Rene Rivera, and Rose Rivera—For personal injuries

82. EMMANUEL RIVERA—For death of sister FLORECETA RIVERA SONOBE

83. JESSE RIVERA—For death of sister FLORECETA RIVERA SONOBE

84. JOEL RIVERA—For death of sister FLORECETA RIVERA SONOBE

85. RENE RIVERA—For death of sister FLORECETA RIVERA SONOBE

86. ROSE RIVERA—For death of sister FLORECETA RIVERA SONOBE

87. SINA SAIPAIA—For death of sister REBECCA SAIPAIA and as Heir and/or Representative of her Estate

88. WILLIE SAIPAIA—For death of sister REBECCA SAIPAIA and as Heir and/or Representative of her Estate

89. JOE SANTOYA—For death of sister JULIE SANTOYA

90. OFILIA SANTOYO—For deaths of grandchildren ABEGAIL MARTINEZ, AUDREY MARTINEZ, CRYSTAL MARTINEZ, ISAEH MARTINEZ, and JOSEPH MARTINEZ, and as Heir and/or Representative of their Estates

91. EMIL SCHNEIDER—For death of granddaughter MAYANAH SCHNEIDER

92. PATRICIA SCHNEIDER—For death of granddaughter MAYANAH SCHNEIDER

93. BRYAN SCHROEDER, through Next Friend Sandra Connizzo—For death of father MICHAEL SCHROEDER, and for injuries to mother KATHRYN SCHROEDER and siblings CHRISTYN MABB, JACOB MABB and SCOTT MABB

94. JAMES SCHROEDER—For death of brother MICHAEL SCHROEDER

95. KATHRYN SCHROEDER—For death of husband MICHAEL SCHROEDER and for injuries to children CHRISTYN MABB, JACOB MABB, SCOTT MABB, and BRYAN SCHROEDER

96. ROBERT A. SCHROEDER—For death of brother MICHAEL SCHROEDER

97. SCOTT SCHROEDER, through Next Friend Linda Schroeder—For death of brother MICHAEL SCHROEDER

98. KAREN SHIGETA—For death of brother MARK WENDEL

99. DOROTHY FORDE SINCLAIR—For death of sister NOVELLETTE SINCLAIR HIPSMAN and as Heir and/or Representative of her Estate

100. REGINALD SINCLAIR—For death of sister NOVELLETTE SINCLAIR HIPSMAN and as Heir and/or Representative of her Estate

101. EDNA SUMMERS—For death of granddaughter STARTLE SUMMERS

102. JEFFREY SUMMERS—For death of brother GREGORY ALLEN SUMMERS

103. MICHAEL L. SUMMERS—For death of granddaughter STARTLE SUMMERS

104. RANDALL KEVIN SUMMERS—For death of brother GREGORY ALLEN SUMMERS

105. TERRY DEAN SUMMERS—For death of brother GREGORY ALLEN SUMMERS

106. JOSHUA SYLVIA, through Next Friend Stanley Sylvia—For deaths of sisters HOLLYWOOD SYLVIA and RACHEL ESTER SYLVIA

107. STANLEY SYLVIA—For injuries to son JOSHUA SYLVIA

108. MARLENE ANN THOMPSON—For deaths of grandchildren DAYLAND LORD LITTLE and KARA BRITTANI LITTLE

109. ALBERT VAEGA—For death of brother NEIL VAEGA and as Heir and/or Representative of his Estate

110. ALLEN VAEGA—For death of brother NEIL VAEGA and as Heir and/or Representative of his Estate

111. AUALEPOIA VAEGA—For death of brother NEIL VAEGA and as Heir and/or Representative of his Estate

112. GEORGE VAEGA—For death of brother NEIL VAEGA and as Heir and/or Representative of his Estate

113. LESLIE M. VAEGA—For death of brother NEIL VAEGA and as Heir and/or Representative of his Estate

114. NESE VAEGA—For death of brother NEIL VAEGA and as Heir and/or Representative of his Estate

115. PEGGY PUTTKAMMER WEISHOFF—For death of sister JUDY VIOLET PETERSON SCHNEIDER

116. ALMA K. WENDEL—For injuries to grandchildren JAUNESSA WENDEL, LANDON WENDEL, PATRON WENDEL, and TAMARAE WENDEL

117. JAUNESSA WENDEL, through next Friend James Cooney—For for injuries to siblings LANDON WENDEL, PATRON WENDEL, and TAMARAE WENDEL

118. KURT WENDEL—For death of brother MARK WENDEL

119. LANDON WENDEL, through Next Friend James Cooney—For injuries to siblings JAUNESSA WENDEL, PATRON WENDEL, and TAMARAE WENDEL

120. PATRON WENDEL, through Next Friend James Cooney—For injuries to siblings JAUNESSA WENDEL, LANDON WENDEL, and TAMARAE WENDEL

121. ROBERT WENDEL—For injuries to grandchildren JAUNESSA WENDEL, LANDON WENDEL, PATRON WENDEL, and TAMARAE WENDEL

122. TAMARAE WENDEL, through Next Friend James Cooney—For injuries to siblings JAUNESSA WENDEL, LANDON WENDEL, and PATRON WENDEL

123. Estate of AGATHA MYRTLE WILLIAMS, through Heir and/or Representative GLADYS WILLIAMS—For death of daughter YVETTE WILLIAMS FAGAN

124. GLADYS WILLIAMS—For death of sister YVETTE WILLIAMS FAGAN

125. COLLETTE SINCLAIR WYNN—For death of sister of NOVELLETTE SINCLAIR HIPSMAN and as Heir and/or Representative of her Estate

It is further

**ORDERED** that Plaintiffs' Motion for Leave to Supplement Response to the Government's Motion for Summary Judgment is GRANTED as the Court has considered the proposed supplements in ruling upon the parties' dispositive motions. It is further

**ORDERED** that Plaintiffs' Motion for Oral Hearing and Supplemental Motion for Oral Hearing are **DENIED**. It is further

**ORDERED** that the Brown Plaintiffs' Motion for Leave to File Supplemental Evidence is **DENIED**. It is further

**ORDERED** that the Motion to Substitute Attorney James G. Touhey is **GRANTED** and the Motion for James G. Touhey to Appear Pro Hac Vice is **DENIED** as moot. It is further

**ORDERED** that any additional pending motions not previously ruled upon by the Court are **DENIED** as moot to the extent such ruling is not inconsistent with the preceding memorandum opinion and order.

In light of the foregoing disposition of pending motions, it appears to the Court that the following issues are left for trial: (1) whether, under the FTCA, the ATF used excessive force on the day of the initial raid on the Compound; (2) whether, under *Bivens* and the FTCA, the FBI used excessive force by firing into the Compound without provocation during the insertion of tear gas and during the fire; and (3) whether, under the FTCA, the FBI was negligent in relation to the fire on April 19 and its extinguishment.

## ATTACHMENT A

### PLAINTIFFS

1. GRACE JASMINE ADAMS—For death of sister REBECCA SAIPAIA and as Heir and/or Representative of her Estate

2. JOSEPH W. ALLEN—For deaths of daughter LORRAINE SYLVIA and grandchildren HOLLYWOOD SYLVIA, RACHEL ESTER SYLVIA, and JOSHUA SYLVIA

3. NORMAN WASHINGTON ALLISON—For personal injuries

4. GUILLERMO ANDRADE—For deaths of daughters JENNIFER ANDRADE and KATHERINE ANDRADE and granddaughter CHANEL ANDRADE

5. ISABEL ANDRADE—For deaths of daughters JENNIFER ANDRADE and KATHERINE ANDRADE and granddaughter CHANEL ANDRADE

6. JACQUELINE ANDRADE—For deaths of sisters JENNIFER ANDRADE and KATHERINE ANDRADE

7. SHELLY AUSLOOS—For death of brother STEVEN SCHNEIDER

8. THOMAS BARRIOS—For deaths of children CRYSTAL JEWEL BARRIOS and ISAIAH BARRIOS

9. DARREN BENNETT—For death of father ALRICK GEORGE BENNETT

10. NICOLE BENNETT, through Next Friend Lucille Maynard—For death of father ALRICK GEORGE BENNETT

11. RHYCE GORDON BENNETT, through Next Friend Lucille Maynard—For death of father ALRICK GEORGE BENNETT

12. ALFRED LeROY BENTA—For death of sister SUSAN MARJORIE BENTA

13. ARTHUR HEARD BENTA—For death of sister SUSAN MARJORIE BENTA

14. LEYTON EUSTACE BENTA—For death of sister SUSAN MARJORIE BENTA

15. MARJORIE E. BENTA—For death of daughter SUSAN MARJORIE BENTA

16. ADELINE SYLVIA BLACK—For deaths of daughters DAISY MARTIN and BERYL THERESA NOGREGA

17. LOWESS ESMERELLA BLAKE—For death of son WINSTON BLAKE

18. ROBERT THEOPHILUS BLAKE—For death of son WINSTON BLAKE

19. BRADLEY BORST—For death of mother MARY JEAN ESTELLA BORST

20. DARREN BORST—For death of mother MARY JEAN ESTELLA BORST

21. LANCE BORST—For death of mother MARY JEAN ESTELLA BORST

22. DEBORAH K. BROWN—For death of daughter SHARI ELAYNA DOYLE, and as Heir and/or Representative of her Estate

23. ROBYN BUNDS—For death of husband DAVID KORESH, and as Heir and/or Representative of his Estate

24. SHERRY ANN BURGO—For death of father FLOYD HOUTMAN, SR.

25. PATRICIA FAGAN CLARKE—For death of mother DORIS ADINA FAGAN

26. JORGE COHEN—For death of brother PABLO COHEN, and as Heir and/or Representative of his Estate

27. RAUL COHEN—For death of brother PABLO COHEN, and as Heir and/or Representative of his Estate

28. SHULAMIT COHEN—For death of son PABLO COHEN, and as Heir and/or Representative of his Estate

29. SANDRA J. CONNIZZO—For death of son MICHAEL SCHROEDER and for injuries to grandson BRYAN SCHROEDER

30. TRACY CONWELL, Administratrix and Legal Representative of the Estates of the following:

CHANEL ANDRADE
JENNIFER ANDRADE
KATHERINE ANDRADE
CRYSTAL JEWEL BARRIOS
ISAIAH BARRIOS
MARY JEAN ESTELLA BORST
PETER BRUCE GENT
PETER HIPSMAN
SHERRY LYNN GALLEGOS JEWELL
DAYLAND LORD LITTLE
KARA BRITTANI (PAGES) LITTLE
JEFFREY CURTIS LITTLE
NICOLE ELIZABETH GENT LITTLE
ABIGAIL MARTINEZ
AUDREY MARTINEZ
JOSEPH MARTINEZ
JAMES LOYE RIDDLE, JR.
JULIE SANTOYA
JUDY VIOLET PETERSON SCHNEIDER
MAYANAH SCHNEIDER
STEVEN SCHNEIDER
MICHAEL SCHROEDER
GREGORY ALLEN SUMMERS
HOLLYWOOD SYLVIA
LORRAINE SYLVIA
RACHEL ESTER SYLVIA
JAYDEAN WENDEL
MARK WENDEL

31. DONELL K. CORNWELL—For death of sister JAYDEAN WENDEL

32. LEANORA LAURA De SILVA—For deaths of sisters DAISY MARTIN and BERYL THERESA NOBREGA

33. JOAQUIN DONES—For death of grandson PETER HIPSMAN

34. MARGIE DOUGLAS—For death of sister MARY JEAN ESTELLA BORST

35. CLIVE DOYLE—For personal injuries and for death of daughter SHARI DOYLE and as Administrator of her Estate

36. EDNA DOYLE—For death of granddaughter SHARI DOYLE and as Heir and/or Representative of her Estate

37. KAREN DOYLE—For death of sister SHARI DOYLE and as Heir a .d/or Representative of her Estate

38. OLIVE JEANIE DUNN—For death of sister SUSAN MARJORIE BENTA

39. DEVON NATHANUEL ELLIOTT—For death of sister BEVERLY ADORE ELLIOTT

40. WENDEL AUGUSTUS ELLIOTT—For death of daughter BEVERLY ADORE ELLIOTT

41. SONIA ELSETH—For death of sister MARY JEAN ESTELLA BORST

42. BLOSTON N. FAGAN—For death of mother DORIS ADINA FAGAN

43. DELROY FAGAN—For death of mother DORIS ADINA FAGAN

44. FITZ ERNEST FAGAN—For death of wife DORIS ADINA FAGAN

45. LIVINGSTON FAGAN—For death of mother DORIS ADINA FAGAN, for death of wife YVETTE WILLIAMS FAGAN, and for personal injuries

46. NEHARA FAGAN, through Next Friend Gladys Williams—For death of mother YVETTE

WILLIAMS FAGAN, and for personal injuries

47. PATRICK NATHANEAL FAGAN—For death of mother DORIS ADINA FAGAN

48. RENAE FAGAN, through Next Friend Gladys Williams—For death of mother YVETTE WILLIAMS FAGAN, and for personal injuries .

49. RENFORD FAGAN—For death of mother DORIS ADINA FAGAN

50. ROBERT FAGAN—For death of mother DORIS ADINA FAGAN

51. ROSLYN FAGAN—For death of mother DORIS ADINA FAGAN

52. LISA MARIE FARRIS, through Heir and/or Representative Katherine Farris—For personal injuries

53. MISTY DAWN FERGUSON—For personal injuries

54. TILLIE FRIESEN—For death of husband RAYMOND FRIESEN, and as Heir and/or Representative of his Estate

55. PAULETTE BRENDA GDANIEC—For death of sister SUSAN MARJORIE BENTA

56. THE GENERAL ASSOCIATION OF THE BRANCH DAVIDIAN 7TH DAY ADVENTIST .

57. BRUCE GENT—For deaths of children PETER GENT and NICOLE GENT KORESH

58. BRUCE GENT, as Heir and/or Representative of the Estates of the following:
PETER GENT
DAYLAND GENT KORESH
NICOLE GENT KORESH
PAIGES KORESH

59. URSULA GEHRMANN—For death of mother MARGARIDA GEHRMANN VAEGA, and as Heir and/or Representative of her Estate

60. ELIZABETH GYARFAS—For deaths of daughter AISHA GYAR-

FAS SUMMERS and granddaughter STARTLE SUMMERS

61. OLIVER GYARFAS, SR.—For deaths of daughter AISHA GYARFAS SUMMERS and granddaughter STARTLE SUMMERS

62. BONNIE HALDEMAN—For deaths of son DAVID KORESH and grandchildren CYRUS BEN JOSEPH, STAR HADASSAH HOWELL, SERENITY SEA JONES KORESH, DAYLAND GENT, PAIGES GENT, BOBBIE LAND KORESH, CHICA JONES KORESH, LITTLE ONE JONES KORESH, STARTLE SUMMERS, CHANEL ANDRADE, and MAYANA SCHNEIDER, and as Heir and/or Representative of their Estates

63. JOSHUA HARDIAL—For death of daughter SANDRA ELAINE HARDIAL

64. UNA HARDIAL—For death of daughter' SANDRA ELAINE HARDIAL

65. DONAIRE HARTY—For death of mother DAISY MARTIN

66. NOEL HARTY—For death of daughter DAISY MARTIN

67. BERRY HAUGEN—For death of sister MARY JEAN ESTELLA BORST

68. CLIFFORD "GORDIE" HAUGEN—For death of sister MARY JEAN ESTELLA BORST

69. CURTIS HAUGEN—For death of sister MARY JEAN ESTELLA BORST

70. DORIS HAUGEN—For death of daughter MARY JEAN ESTELLA BORST

71. GLEN HAUGEN—For death of sister MARY JEAN ESTELLA BORST

72. SAMUEL ORESTA HENRY—For deaths of children DIANA HENRY, PAULINA HENRY,

PHILLIP GRAHAM HENRY, STEPHEN GEORGE HENRY, and VANESSA HENRY, and wife ZILLA HENRY

73. CATHERINE HIPSMAN—For death of brother PETER HIPSMAN

74. EUGENE HIPSMAN—For death of son PETER HIPSMAN

75. EUGENE HIPSMAN, JR.—For death of brother PETER HIPSMAN

76. FILMENA HIPSMAN—For death of son PETER HIPSMAN

77. JOHN CHARLES HIPSMAN— For death of brother PETER HIPSMAN

78. MICHAEL RALPH HIPSMAN— For death of brother PETER HIPSMAN

79. MILDRED HIPSMAN—For death of grandson PETER HIPSMAN

80. PAUL JOHN HIPSMAN—For death of brother PETER HIPSMAN

81. STEPHAN M. HIPSMAN—For death of brother PETER HIPSMAN

82. JEAN HOLUB—Co-Administrator and Legal Representative for Estates of BOBBIE LAYNE KORESH, STAR HADASSAH HOWELL, and CYRUS BEN JOSEPH HOWELL

83. PEARL HORSFIELD—For death of sister LORRAINE SYLVIA

84. LUCILDA McBEAN HOSTEN— For death of son JOHN McBEAN

85. DANA HOUTMAN—For death of father FLOYD HOUTMAN, SR., and as Heir and/or Representative of his Estate

86. FLOYD HOUTMAN, JR.—For death of father FLOYD HOUTMAN, SR., and as Heir and/or Representative of his Estate

87. GABRIELLA MARIE HOUTMAN—For death of father FLOYD HOUTMAN, SR.

88. JOEL MATTHEW HOUTMAN— For death of father FLOYD HOUTMAN, SR.

89. JUDITH MARIE HOUTMAN— For death of husband FLOYD HOUTMAN, SR.

90. TOBIAS HOSEA HOUTMAN— For death of father FLOYD HOUTMAN, SR.

91. BOBBY WAYNE HOWELL—Co-Administrator and Legal Representative for the Estates of BOBBIE LAYNE KORESH, STAR HADASSAH HOWELL and CYRUS BEN JOSEPH HOWELL

92. MARIE CORNWELL HUTCHISON—For death of daughter JAYDEAN WENDEL and grandchildren JAUNESSA WENDEL, LANDON WENDEL, PATRON WENDEL, and TAMARAE WENDEL

93. SUE JOHNSON—For death of brother STEVE SCHNEIDER

94. HEATHER JONES, through Next Friend Katherine Jones—For death of father DAVID JONES and as Heir and/or Representative of his Estate

95. JOEL JONES—For deaths of father PERRY JONES and siblings RACHAEL JONES HOWELL KORESH, MICHELLE JONES KORESH, and DAVID JONES, and as Heir and/or Representative of their Estates

96. KEVIN JONES, through Next Friend Katherine Jones—For death of father DAVID JONES and as Heir and/or Representative of his Estate

97. MARK JONES, through Next Friend Katherine Jones—For death of father DAVID JONES

and as Heir and/or Representative of his Estate

98. MARY BELLE JONES—For deaths of husband PERRY JONES, children DAVID JONES, RACHAEL JONES, and MICHELLE HOWELL KORESH, and grandchildren CYRUS HOWELL KORESH, STAR HOWELL KORESH, BOBBIE LANE KORESH, SERENITY SEA KORESH, CHAHKA KORESH and LITTLE ONE JONES KORESH, and as Heir and/or Representative of their Estates

99. SAMUEL N. JONES—For deaths of father PERRY JONES and siblings DAVID JONES, MICHELLE JONES, and RACHEL JONES HOWELL KORESH

100. SHAUN WISDOM HOWELL KORESH, through Next Friend Robyn Bunds—for death of father DAVID KORESH

101. AARON JAY LITTLE—For death of brother JEFFREY CURTIS LITTLE

102. LONNIE C. LITTLE—For deaths of son JEFFREY CURTIS LITTLE and grandchildren DAYLAND LORD LITTLE and KARA BRITTANI LITTLE

103. PATRICIA MAY LITTLE—For deaths of son JEFFREY CURTIS LITTLE and grandchildren DAYLAND LORD LITTLE and KARA BRITTANI LITTLE

104. STUART A. LITTLE—For death of brother JEFFREY CURTIS LITTLE

105. DEREK LOVELOCK—For personal injuries

106. CHRISTYN MABB, through Next Friend William Mabb—Personal injuries and for injuries suffered by mother KATHRYN SCHROEDER and siblings JACOB MABB, SCOTT MABB, and BRYAN SCHROEDER

107. JACOB MABB, through Next Friend William Mabb—Personal injuries and for injuries suffered by mother KATHRYN SCHROEDER and siblings CHRISTYN MABB, SCOTT MABB, and BRYAN SCHROEDER

108. SCOTT MABB, through next Friend William Mabb—Personal injuries and for injuries suffered by mother KATHRYN SCHROEDER and siblings CHRISTYN MABB, JACOB MABB, and BRYAN SCHROEDER

109. WILLIAM MABB—For personal injuries and for injuries suffered by children CHRISTYN MABB, JACOB MABB, and SCOTT MABB

110. GAIL MAGEE—For death of sister LORRAINE SYLVIA

111. SOLOMAN MALCOLM, JR.—For death of brother LIVINGSTON ALEXANDER MALCOLM

112. Estate of SOLOMAN MALCOLM, SR., through His Heir Soloman Malcolm, Jr.—For the death of son LIVINGSTON ALEXANDER MALCOLM

113. DANIEL MARTIN, through next Friend Sheila Judith Martin—For death of father DOUGLAS WAYNE MARTIN and siblings LISA MARTIN, ANITA MARTIN, SHEILA MARTIN and WAYNE JOSEPH MARTIN, and as Heir and/or Representative of their Estates

114. HELEN MARTIN—For deaths of son DOUGLAS WAYNE MARTIN and grandchildren ANITA MARIE MARTIN, LISA MARIE MARTIN, SHEILA RENEE MARTIN, and WAYNE JOSEPH MARTIN

115. JAMES MARTIN, through Next Friend Sheila Judith Martin—For deaths of father DOUGLAS

WAYNE MARTIN and siblings LISA MARTIN, ANITA MARTIN, SHEILA MARTIN, and WAYNE JOSEPH MARTIN, and as Heir and/or Representative of their Estates

116. JoANN MARTIN—For death of brother DOUGLAS WAYNE MARTIN

117. JOSEPH W. MARTIN—For deaths of son DOUGLAS WAYNE MARTIN and grandchildren ANITA MARIE MARTIN, LISA MARIE MARTIN, SHEILA RENEE MARTIN, and WAYNE JOSEPH MARTIN

118. KIMBERLY MARTIN, through Next Friend Sheila Judith Martin—For death of father DOUGLAS WAYNE MARTIN and siblings LISA MARTIN, ANITA MARTIN, SHEILA MARTIN, and WAYNE JOSEPH MARTIN, and as Heir and/or Representative of their Estates

119. NORMAN J. MARTIN—For death of brother DOUGLAS WAYNE MARTIN

120. SHEILA JUDITH MARTIN—For deaths of husband DOUGLAS WAYNE MARTIN and children LISA MARTIN, ANITA MARTIN, SHEILA MARTIN, and WAYNE JOSEPH MARTIN, and as Heir and/or Representative of their Estates

121. DANIEL MARTINEZ, JR., through Next Friend Daniel Martinez, Sr.—For deaths of mother JULIE SANTOYA and siblings CRYSTAL JEWEL BARRIOS, ISAIAH BARRIOS, ABIGAIL MARTINEZ, AUDREY MARTINEZ, and JOSEPH MARTINEZ

122. DANIEL MARTINEZ, SR.—For deaths of children ABIGAIL MARTINEZ, AUDREY MARTINEZ, and JOSEPH MARTINEZ

123. LUCILLE MAYNARD—For death of son ALRICK GEORGE BENNETT

124. RANSFORD McBEAN—For death of son JOHN McBEAN

125. GAIL MONBELLY—For death of sister ALLISON BERNADETTE MONBELLY

126. JOSEPHART MONBELLY—For death of daughter ALLISON BERNADETTE MONBELLY

127. MARY ANNA MONBELLY—For death of daughter ALLISON BERNADETTE MONBELLY

128. J.P. MORRISON—For deaths of daughter ROSEMARIE MORRISON and granddaughter MELISSA MORRISON

129. MICHAEL MORRISON—For death of sister ROSEMARIE MORRISON

130. N. A. MORRISON—For deaths of daughter ROSEMARIE MORRISON and granddaughter MELISSA MORRISON

131. RUTH MOSHER—For death of daughter SHERRY LYNN GALLEGOS

132. ANDREW VINCENT NOBREGA—For death of mother BERYL THERESA NOBREGA

133. NATALIE PRISCILLA NOBREGA, through Next Friend Vincent W. Nobrega—For personal injuries and for death of mother BERYL THERESA NOBREGA

134. VINCENT W. NOBREGA—For death of wife BERYL THERESA NOBREGA

135. WAYNE C. NOBREGA—For death of mother BERYL THERESA NOBREGA

136. DANA OKIMOTO—For death of husband DAVID KORESH, and as Heir and/or Representative of his Estate

137. JARED MICHAEL OKIMOTO, through Next Friend Dana Okimoto—For death of father DAVID KORESH, and as Heir and/or Representative of his Estate

138. SKY BORN OKIMOTO, through Next Friend Dana Okimoto—For death of father DAVID KORESH, and as Heir and/or Representative of his Estate

139. CHRISTIAN ANDREW OLSEN, through Next Friend KIMBERLY LAMBERT—For death of father GREGORY ALLEN SUMMERS

140. MARGARET PARKER—For deaths of daughter LORRAINE SYLVIA and grandchildren HOLLYWOOD SYLVIA and RACHEL ESTER SYLVIA, and for injuries to grandson JOSHUA SYLVIA

141. DAVID PEARCE, JR.—For deaths of mother LORRAINE SYLVIA and siblings HOLLYWOOD SYLVIA and RACHEL ESTER SYLVIA, and for injuries to brother JOSHUA SYLVIA

142. JULIE PEARCE—For deaths of mother LORRAINE SYLVIA and siblings HOLLYWOOD SYLVIA and RACHEL ESTER SYLVIA, and for injuries to brother JOSHUA SYLVIA

143. EARL PETERSON—For deaths of daughter JUDY VIOLET PETERSON SCHNEIDER and granddaughter MAYANAH SCHNEIDER

144. WAYNE F. PETERSON—For death of sister JUDY VIOLET PETERSON SCHNEIDER

145. SHIRLEY PUTTKAMMER—For deaths of daughter JUDY VIOLET PETERSON SCHNEIDER and granddaughter MAYANAH SCHNEIDER

146. SIDNEE REAMER—For death of brother STEVEN SCHNEIDER

147. ANETTA ROBINSON RICHARDS—For personal injuries

148. JAMES LOYE RIDDLE, SR.—For death of son JAMES LOYE RIDDLE, JR.

149. MYRTLE ANN RIDDLE—For death of son JAMES LOYE RIDDLE, JR.

150. RITA FAYE RIDDLE—For personal injuries and for death of brother JAMES LOYE RIDDLE, JR.

151. RUTH OTTMAN RIDDLE—For personal injuries and for death of husband JAMES LOYE RIDDLE, JR.

152. Estate of FLORECETA RIVERA SONOBE, through Heirs and/or Representatives Anacleto Rivera, Cirila Rivera, Elpedio Rivera, Emmanuel Rivera, Jesse Rivera, Joel Rivera, Rene Rivera, and Rose Rivera—For personal injuries

153. CIRILA RIVERA—For death of daughter FLORECETA RIVERA SONOBE

154. EMMANUEL RIVERA—For death of sister FLORECETA RIVERA SONOBE

155. JESSE RIVERA—For death of sister FLORECETA RIVERA SONOBE

156. JOEL RIVERA—For death of sister FLORECETA RIVERA SONOBE

157. RENE RIVERA—For death of sister FLORECETA RIVERA SONOBE

158. ROSE RIVERA—For death of sister FLORECETA RIVERA SONOBE

159. LONA SAIPAIA—For death of daughter REBECCA SAIPAIA

and as Heir and/or Representative of her Estate

160. SINA SAIPAIA—For death of sister REBECCA SAIPAIA and as Heir and/or Representative of her Estate

161. WILLIE SAIPAIA—For death of sister REBECCA SAIPAIA and as Heir and/or Representative of her Estate

162. JOE SANTOYA—For death of sister JULIE SANTOYA

163. OFILIA SANTOYO—For deaths of daughter JULIETTE SANTOYO MARTINEZ and grandchildren ABEGAIL MARTINEZ, AUDREY MARTINEZ, CRYSTAL MARTINEZ, ISAEH MARTINEZ, and JOSEPH MARTINEZ, and as Heir and/or Representative of their Estates

164. EMIL SCHNEIDER—For deaths of son STEVEN SCHNEIDER and granddaughter MAYANAH SCHNEIDER

165. PATRICIA SCHNEIDER—For deaths of son STEVEN SCHNEIDER and granddaughter MAYANAH SCHNEIDER

166. BRYAN SCHROEDER, through Next Friend Sandra Connizzo—For death of father MICHAEL SCHROEDER, for personal injuries, and for injuries to mother KATHRYN SCHROEDER and siblings CHRISTYN MABB, JACOB MABB and SCOTT MABB

167. JAMES SCHROEDER—For death of brother MICHAEL SCHROEDER

168. KATHRYN SCHROEDER—For death of husband MICHAEL SCHROEDER and for injuries to children CHRISTYN MABB, JACOB MABB, SCOTT MABB, and BRYAN SCHROEDER

169. ROBERT A. SCHROEDER—For death of brother MICHAEL SCHROEDER

170. SCOTT SCHROEDER, through Next Friend Linda Schroeder—For death of brother MICHAEL SCHROEDER

171. GEOFFREY N. SELLORS—For death of son CLIFFORD GARY SELLORS

172. MARJORIE SELLORS—For death of son CLIFFORD GARY SELLORS

173. KAREN SHIGETA—For death of brother MARK WENDEL

174. DOROTHY FORDE SINCLAIR—For death of sister NOVELLETTE SINCLAIR HIPSMAN and as Heir and/or Representative of her Estate

175. JOHN SINCLAIR—For death of daughter NOVELLETTE SINCLAIR HISPMAN and as Heir and/or Representative of her Estate

176. REGINALD SINCLAIR—For death of sister NOVELLETTE SINCLAIR HIPSMAN and as Heir and/or Representative of her Estate

177. ANGELICA SONOBE, through Next Friend Kenneth Goro Sonobe—For deaths of parents SCOTT KOJIRO SONOBE and FLORECETA RIVERA SONOBE and as Heir and/or Representative of their Estates

178. CRYSTAL SONOBE, through Next Friend Kenneth Goro Sonobe—For deaths of parents SCOTT KOJIRO SONOBE and FLORECETA RIVERA SONOBE and as Heir and/or Representative of their Estates

179. KENNETH GORO SONOBE—For death of son SCOTT KOJIRO SONOBE and as Heir and/or Representative of his Estate

180. EDNA SUMMERS—For deaths of son GREGORY ALLEN SUM-

MERS and granddaughter STARTLE SUMMERS

181. JEFFREY SUMMERS—For death of brother GREGORY ALLEN SUMMERS

182. MICHAEL L. SUMMERS—For deaths of son GREGORY ALLEN SUMMERS and granddaughter STARTLE SUMMERS

183. RANDALL KEVIN SUMMERS—For death of brother GREGORY ALLEN SUMMERS

184. TERRY DEAN SUMMERS— For death of brother GREGORY ALLEN SUMMERS

185. JOSHUA SYLVIA, through Next Friend Stanley Sylvia—For deaths of mother LORRAINE SYLVIA and sisters HOLLYWOOD SYLVIA and RACHEL ESTER SYLVIA and for personal injuries

186. STANLEY SYLVIA—For deaths of wife LORRAINE SYLVIA and daughters HOLLYWOOD SYLVIA and RACHEL ESTER SYLVIA and for injuries to son JOSHUA SYLVIA

187. DAVID THIBODEAU—For personal injuries

188. MARJORIE VENETIA THOMAS—For personal injuries

189. MARLENE ANN THOMPSON—For deaths of children PETER BRUCE GENT and NICOLE ELIZABETH GENT and grandchildren DAYLAND LORD LITTLE and KARA BRITTANI LITTLE

190. STEPHEN E. THOMPSON, Administrator and Legal Representative of the Estates of the following:

ALRICK GEORGE BENNETT
SUSAN MARJORIE BENTA
WINSTON BLAKE
BEVERLY ADORE ELLIOTT
DORIS ADINA FAGAN
YVETTE WILLIAMS FAGAN
SANDRA ELAINE HARDIAL
DIANA HENRY
PAULINA HENRY
PHILLIP G. HENRY
STEPHEN G. HENRY
VANESSA HENRY
ZILLA HENRY
LIVINGSTON A. "MIKE" MALCOLM
DAISY MARTIN
JOHN McBEAN
ALLISON BERNADETTE MONBELLY
ROSEMARIE MORRISON
MELISSA MORRISON
BERYL THERESA NOBREGA
CLIFFORD GARY SELLORS
AISHA GYARFAS SUMMERS
STARTLE SUMMERS

191. ALBERT VAEGA—For death of brother NEIL VAEGA and as Heir and/or Representative of his Estate

192. ALLEN VAEGA—For death of brother NEIL VAEGA and as Heir and/or Representative of his Estate

193. AUALEPOIA VAEGA—For death of brother NEIL VAEGA and as Heir and/or Representative of his Estate

194. GEORGE VAEGA—For death of brother NEIL VAEGA and as Heir and/or Representative of his Estate

195. JOANNE VAEGA, through Next Friend Ursula Gehrman—For deaths of parents NEIL VAEGA and MARGARIDA GEHRMANN VAEGA, and as Heir and/or Representative of their Estates

196. LESLIE M. VAEGA—For death of brother NEIL VAEGA and as Heir and/or Representative of his Estate

197. NESE VAEGA—For death of brother NEIL VAEGA and as

Heir and/or Representative of his Estate

198. VAILOA VAEGA—For death of son NEIL VAEGA and as Heir and/or Representative of his Estate

199. PEGGY PUTTKAMMER WEISHOFF—For death of sister JUDY VIOLET PETERSON SCHNEIDER

200. ALMA K. WENDEL—For death of son MARK WENDEL and for injuries to grandchildren JAUNESSA WENDEL, LANDON WENDEL, PATRON WENDEL, and TAMARAE WENDEL

201. JAUNESSA WENDEL, through next Friend James Cooney—For deaths of mother JAYDEAN WENDEL and father MARK WENDEL, for injuries to siblings LANDON WENDEL, PATRON WENDEL, and TAMARAE WENDEL, and for personal injuries

202. KURT WENDEL—For death of brother MARK WENDEL

203. LANDON WENDEL, through Next Friend James Cooney—For deaths of mother JAYDEAN WENDEL and father MARK WENDEL, for injuries to siblings JAUNESSA WENDEL, PATRON WENDEL, and TAMARAE WENDEL, and for personal injuries

204. PATRON WENDEL, through Next Friend James Cooney—For deaths of mother JAYDEAN WENDEL and father MARK WENDEL, for injuries to siblings JAUNESSA WENDEL, LANDON WENDEL, and TAMARAE WENDEL, and for personal injuries

205. ROBERT WENDEL—For death of son MARK WENDEL and for injuries to grandchildren JAUNESSA WENDEL, LANDON WENDEL, PATRON WENDEL, and TAMARAE WENDEL

206. TAMARAE WENDEL, through Next Friend James Cooney—For deaths of mother JAYDEAN WENDEL and father MARK WENDEL, for injuries to siblings JAUNESSA WENDEL, LANDON WENDEL, and PATRON WENDEL, and for personal injuries

207. Estate of AGATHA MYRTLE WILLIAMS, through Heir and/or Representative GLADYS WILLIAMS—For death of daughter YVETTE WILLIAMS FAGAN

208. GLADYS WILLIAMS—For death of sister YVETTE WILLIAMS FAGAN

209. COLLETTE SINCLAIR WYNN—For death of sister of NOVELLETTE SINCLAIR HIPSMAN and as Heir and/or Representative of her Estate

### *ATTACHMENT B*

#### DEFENDANTS

1. DAVY AGUILERA—Special Agent, ATF

2. ROBERT BALDERSTON—Pathfinder, Texas National Guard

3. ROBERT BERNHART—Crewchief, Texas National Guard

4. WILLIAM BUFORD—Resident Agent in Charge of Little Rock, Arkansas Field Office and Co–Team Leader of New Orleans, Louisiana Special Response Team, ATF

5. JAMES CAVANAUGH—Assistant Special Agent in Charge of Dallas, Texas Field Office, ATF

6. PHILLIP J. CHOJNACKI—Special Agent in Charge of Houston, Texas Field Office, ATF

7. DANIEL EDWARD CONROY—Deputy Associate Director for Law Enforcement, ATF

8. EDWARD S.G. DENNIS, JR.—Contractor to United States Department of Justice

9. BRYAN DICKENS—Co-pilot, Texas National Guard

10. EARL DUNAGAN—Acting Resident Agent in Charge of Austin, Texas Resident Office, ATF

11. DARRELL DYER—Assistant Special Agent in Charge of Kansas City, Missouri Field Office, ATF

12. DARWIN FINCH—Co-pilot, Texas National Guard

13. JEFFREY FREELOVE—Co-pilot, Texas National Guard

14. TIMOTHY GABORIE—Special Agent, ATF

15. FERNANDO GRAJALES—Pathfinder, Texas National Guard

16. DANIEL M. HARTNETT—Associate Director of Law Enforcement, ATF

17. STEPHEN E. HIGGINS—Director, ATF

18. LON T. HORIUCHI—Assistant Special Agent in Charge, FBI

19. WEBSTER L. HUBBELL—Associate United States Attorney General

20. STANLEY HUNTLEY—Pilot, Texas National Guard

21. JEFFREY J. JAMAR—Special Agent in Charge of San Antonio, Texas Field Office, FBI

22. WILLIAM JOHNSTON—Assistant United States Attorney, Western District of Texas

23. PETER B. MASTIN—Special Agent in Charge, New Orleans, Louisiana Law Enforcement Field Office, ATF

24. JOHN McGRAW—Director, ATF

25. WILLIAM PETTIT—Commander, Texas National Guard

26. LAWRENCE A. POTTS—Assistant Director of Criminal Investigative Division, FBI

27. JANET RENO—Attorney General of the United States

28. OLIVER B. REVELL—Special Agent in Charge of Dallas, Texas Field Office, FBI

29. TOMMY REYNOLDS—Video Camera Operator, Texas National Guard

30. ANN RICHARDS—Former Governor of the State of Texas

31. ROBERT A. RICKS—Special Agent in Charge of Oklahoma City, Oklahoma Field Office, FBI

32. ROBERT RODRIGUEZ—Special Agent, ATF

33. RICHARD ROGERS—Commander, Hostage Rescue Team, FBI

34. TED ROYSTER—Special Agent in Charge of Dallas, Texas Law Enforcement Field Office, ATF

35. BYRON SAGE—Assistant Special Agent in Charge of Austin, Texas Field Office, FBI

36. CHARLES SARABYN—Assistant Special Agent in Charge of Houston, Texas Field Office, ATF

37. JERRY SEGRAVES—Co-pilot, Texas National Guard

38. WILLIAMS S. SESSIONS—Director of the FBI

39. DOYLE STONE—Pilot, Texas National Guard

40. GINO TREVINO—Photo Interpreter, Texas National Guard

41. DAVID C. TROY—Chief of Intelligence, ATF

42. UNITED STATES OF AMERICA